MESSANO, P.J.A.D.
*261 *280 In 1991, the New Jersey Department of Environmental Protection (DEP) and Exxon Mobil Corporation (Exxon) entered into two administrative consent orders (ACOs), requiring Exxon to remediate polluted sites it owned and operated at the Bayway Refinery in Linden (Bayway) and the Bayonne Facility (Bayonne). In addition to requiring Exxon to pay a civil penalty, the ACOs required the company to: undertake remedial investigations; prepare work plans and feasibility studies; undertake all additional investigations and actions necessary to remediate the sites under DEP's supervision; submit quarterly progress reports; and reimburse DEP for all oversight costs and costs incurred in investigating and responding to Exxon's discharges. See N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 393 N.J. Super. 388, 391-93, 923 A.2d 345 (App. Div. 2007) ( Exxon I ) (providing historical background regarding operation of these two sites and the ACOs).
Under the ACOs, the State of New Jersey reserved its right to recover additional "natural resource damages" (NRD), i.e., compensation for the injury and destruction of natural resources and the public's loss of the use and enjoyment of those resources. In August 2004, DEP filed two complaints against Exxon seeking NRD at Bayway and Bayonne, and asserting claims under the Spill Compensation and Control Act, N.J.S.A. 58:10-23.11 to -23.24 *281 (Spill Act), and common law theories of public nuisance and trespass. *262 We need not discuss in detail pretrial rulings and controversies, except to note that in 2006, the trial court granted DEP summary judgment holding Exxon was strictly liable for NRD and restoration costs under the Spill Act. It also dismissed DEP's NRD claim for "loss of use damages." We granted DEP leave to appeal-Exxon did not seek interlocutory review-and, in Exxon I, 393 N.J. Super. at 410, 923 A.2d 345, we reversed and restored DEP's claim for "loss of use" NRD damages. In New Jersey Department of Environmental Protection v. Exxon Mobil Corp., 420 N.J. Super. 395, 397-98, 22 A.3d 1 (App. Div. 2011) ( Exxon II ), we reversed the trial court's dismissal of DEP's strict liability claim, which was added in an amended complaint, on statute of limitations grounds. In 2014, Judge Michael J. Hogan presided over a sixty-six day bench trial.
Both DEP and Exxon moved pre-trial to bar the testimony of all or most of their adversaries' experts. Rather than conduct pre-trial hearings to determine admissibility, see N.J.R.E. 104(a), with the judge's approval, all experts testified while the parties preserved their objections. Utilizing a complex, mathematical methodology known as "Habitat Equivalency Analysis" (HEA), DEP's experts estimated that NRD damages at both sites totaled $8.9 billion. Exxon's experts challenged the admissibility of any opinions based on HEA in the first instance, although, as Judge Hogan noted in his written decision, Exxon's experts, utilizing HEA, estimated NRD damages to be between $1.4 and $3 million.[1]
*282 After two days of summations and the submission of written closing arguments, Judge Hogan set about to render a written decision on the reserved N.J.R.E. 104(a) motions and the case in chief. Before he did, however, the parties advised they had reached a settlement.
Under the terms of the proposed consent judgment, Exxon agreed to pay $225 million to the state treasurer, and the State agreed to place that money in a segregated account within the Hazardous Discharge Site Cleanup Fund, where the monies "shall earn interest and may not be used for any purpose" until the consent judgment "becomes final and non-appealable." The State also agreed to: release Exxon from all NRD claims based on the discharge of contaminants onto the soil and sediments of Bayway and Bayonne; dismiss surface water NRD claims without prejudice to raising them, under certain conditions, in a future action; release Exxon with prejudice and covenants not to sue for all NRD claims relating to more than one thousand Exxon retail gas stations in New Jersey, excluding those where methyl tertiary butyl ether (MTBE)[2] had been discharged; release Exxon with prejudice from all NRD claims relating to sixteen other statewide facilities (designated as *263 Attachment C facilities), including the former Paulsboro Terminal, which had been the subject of ongoing litigation since 2007, but excluding those facilities where MTBE had been discharged; and defer the final remedy determination and remediation of Morses Creek near Bayway until Exxon ceased refining operations at the site.
The parties further agreed that: the consent judgment would not alter, suspend, or otherwise impact Exxon's obligations under any ACO, except for the Morses Creek deferral; the State would retain full authority and sole discretion to require Exxon to take any action to "address an immediate environmental concern, an *283 imminent and substantial endangerment to public health, welfare or the environment, or an emergency response arising from or related to" Bayway, Bayonne, the gas stations and Attachment C facilities; and, the court would retain continued jurisdiction and enforcement of the consent judgment's terms. Lastly, the consent judgment declared that nothing contained therein "shall be considered an admission by [Exxon]," and it granted Exxon contribution protection "to the fullest extent possible" pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601 - 675, the Spill Act, and any other statute, regulation, or common law principle that allowed contribution rights against Exxon.[3]
DEP provided notice of the proposed consent judgment in accordance with N.J.S.A. 58:10-23.11e2. See Cumberland Farms, Inc. v. N.J. Dep't of Envtl. Prot., 447 N.J. Super. 423, 441, 148 A.3d 767 (App. Div. 2016) ("[U]nder N.J.S.A. 58:10-23.11e2, the DEP and a potentially responsible party may not agree to a settlement of NRD liability until after the DEP has published notice of the terms of the settlement."), certif. denied, 229 N.J. 149, 160 A.3d 701 (2017). DEP received 16,013 public comments, mostly objections, including comments from Raymond J. Lesniak, a resident of the Bayway section of Elizabeth and State Senator for the 20th Legislative District, (appellant in A-0668-15), and the New Jersey Sierra Club, Clean Water Action, Environment New Jersey, and Delaware Riverkeeper Network (collectively, the Environmental Groups) (appellants in A-0810-15).
Before DEP responded to the comments and indicated whether it intended to seek approval of the consent judgment or not, Lesniak and the Environmental Groups moved to intervene in the lawsuit. In a written opinion, Judge Hogan denied those motions without prejudice.
*284 The same day, DEP issued its response to the public comments, portions of which we summarize. DEP stated the proposed judgment was the second largest NRD settlement with a single corporate defendant in United States' history, and the largest NRD settlement in New Jersey's history. DEP asserted that Exxon had already spent more than $130 million remediating Bayway and more than $120 million remediating Bayonne, and that the proposed consent judgment would not change or cap Exxon's continued obligation to "spend whatever amount of money is necessary to fully remediate all of its contaminated sites in accordance with DEP's regulatory standards."
DEP also noted "numerous and significant" legal and evidentiary issues in the lawsuit were still unresolved, with no assurance DEP would ultimately succeed. For example, early pretrial decisions in the *264 State's favor as to liability could be subject to appeal and ultimately reversed. Additionally, Judge Hogan had not yet ruled on the admissibility of DEP's experts' opinions, or determined the amount of NRD, if any, actually proven by the State. Under the proposed settlement, Exxon gave up its right to appeal all issues. DEP further noted that the proposed consent judgment did not settle claims against Exxon at gas stations and other facilities where MTBE was discovered.
With Exxon's support, DEP subsequently moved before Judge Hogan for approval of the settlement. Judge Hogan permitted the Environmental Groups and Lesniak to appear as amicus curiae. They filed extensive briefs and orally argued against approval.
In a written decision and conforming order filed August 25, 2015, Judge Hogan approved the consent judgment, holding it was fair, reasonable, faithful to the Spill Act's goals, and in the public interest. He concluded that DEP had applied "rational methods" to estimate total damages and to determine what Exxon's fair payment would be for those damages, and that $225 million represented "a reasonable compromise given the substantial litigation risks the DEP faced at trial and would face on appeal." The *285 court filed a fully executed consent judgment on August 31, 2015; Exxon tendered payment a few weeks later.
The Environmental Groups and Lesniak renewed their requests to intervene, arguing in part that intervention was appropriate so they could appeal Judge Hogan's approval of the consent judgment. By orders dated October 9, 2015, accompanied by a comprehensive written decision, Judge Hogan denied both applications with prejudice.
These appeals followed. We have consolidated them now for purposes of issuing a single opinion.
I.
Appellants argue Judge Hogan erred in concluding standing was a prerequisite to their intervention in the lawsuit, and, even if he was correct, they established standing both to intervene at trial and to challenge the court's approval of the consent judgment on appeal. We first consider whether standing is a prerequisite to intervention at trial, and, if so, whether appellants had standing to intervene.
A.
Our Rules of Court govern intervention at trial, and the trial court's interpretation of those rules is subject to our de novo review. Washington Commons, L.L.C. v. City of Jersey City, 416 N.J. Super. 555, 560, 7 A.3d 225 (App. Div. 2010). "We apply familiar canons of statutory construction to interpret the court rules[,] ... look[ing] first to the plain language ... and giv[ing] the words their ordinary meaning." Robertelli v. N.J. Office of Att'y Ethics, 224 N.J. 470, 484, 134 A.3d 963 (2016) (citations omitted). "We also read the language of a rule 'in context with related provisions so as to give sense to the [court rules] as a whole.' " Ibid. (quoting Wiese v. Dedhia, 188 N.J. 587, 592, 911 A.2d 479 (2006) ).
*286 Rule 4:33-1 governs intervention as of right. To satisfy the rule, a moving party must
(1) claim "an interest relating to the property or transaction which is the subject of the transaction," (2) show [that the movant] is "so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest," (3) demonstrate *265 that the "[movant's] interest" is not "adequately represented by existing parties," and (4) make a "timely" application to intervene.
[ Am. Civil Liberties Union of N.J., Inc. v. Cty. of Hudson, 352 N.J. Super. 44, 67, 799 A.2d 629 (App. Div. 2002) ( ACLU ) (quoting Meehan v. K.D. Partners, L.P., 317 N.J. Super. 563, 568, 722 A.2d 938 (App. Div. 1998) ).]
"As the rule is not discretionary, a court must approve an application for intervention as of right if the four criteria are satisfied." Meehan, 317 N.J. Super. at 568, 722 A.2d 938.
On the other hand, Rule 4:33-2 (emphasis added) permits intervention "[u]pon timely application ... if the claim or defense and the main action have a question of law or fact in common." The rule must be "liberally construed ... with a view to whether intervention will unduly delay or prejudice the adjudication of the rights of the original parties[,]" ACLU, 352 N.J. Super. at 70, 799 A.2d 629, "and whether intervention will eliminate the need for subsequent litigation." Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 341, 676 A.2d 1065 (1996) (citation omitted). The decision to grant or deny permissive intervention "vests considerable discretion in the trial court[,]" Evesham Township Zoning Board of Adjustment v. Evesham Township Council, 86 N.J. 295, 299, 430 A.2d 922 (1981), thus we review the court's determination of a permissive intervention motion under an abuse of discretion standard. City of Asbury Park v. Asbury Park Towers, 388 N.J. Super. 1, 12, 905 A.2d 880 (App. Div. 2006).
Whether permissible intervention or intervention as of right, a party must comply with the procedure set out in Rule 4:33-3 (emphasis added):
A person desiring to intervene shall file and serve on all parties a motion to intervene stating the grounds therefor and accompanied by a pleading setting forth the claim or defense for which intervention is sought along with a Case Information Statement pursuant to R. 4:5-1(b)(1).
*287 This procedure is "mandatory," Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 4:33-3 (2018), although courts should liberally permit movants "reasonable opportunities to cure procedural defects in their motions to intervene." ACLU, 352 N.J. Super. at 66-67, 799 A.2d 629 (emphasis added).
Rule 4:33-3 requires the movant to set forth a "claim or defense" in its pleading to intervene. Rule 4:33-2, the more liberal permissive intervention rule, provides the standard to guide the motion court's exercise of discretion, i.e., intervention is appropriate "if [the movant's] claim or defense" presents "a question of law or fact in common" with the pending action. Ibid. Under the plain language of these two Rules, intervention is not appropriate unless the putative intervenor can assert its own "claim or defense." See Pressler & Verniero, cmt. 1 on R. 4:33-2 ("Clearly those without standing in the first instance are also without sufficient interest to warrant intervention."). If the moving party must have standing to assert its own claim or defense before the court exercises its discretion and permits intervention, it seems illogical that in some situations a court must grant intervention under Rule 4:33-1, even if the movant cannot assert its own claim or defense.
Appellants argue that none of our reported cases has squarely held that a putative intervenor must establish standing in order to intervene successfully under either Rule 4:33-1 or 4:33-2. We do not necessarily disagree.
*266 However, when considering whether a third party may become directly involved in pending litigation or administrative action, our courts have repeatedly used the phrase "standing to intervene" as conceptually equivalent to "standing." See, e.g., State v. N.J. Zinc Co., 40 N.J. 560, 576-78, 193 A.2d 244 (1963) (holding that the holder of an unexercised option to buy land lacked standing to intervene or participate in a condemnation proceeding); N.J. Div. of Youth & Family Servs. v. D.P., 422 N.J. Super. 583, 602-03, 29 A.3d 1116 (App. Div. 2011) (concluding resource parents, statutorily-barred from becoming parties to a Title Nine proceeding, lacked "standing to intervene");
*288 In re A.S., 388 N.J. Super. 521, 524-26, 909 A.2d 757 (App. Div. 2006) (holding adoption agency lacked standing to intervene in Title Nine action); Loigman v. Twp. Comm. of Middletown, 297 N.J. Super. 287, 297, 687 A.2d 1091 (App. Div. 1997) (citing with approval Woodbridge State School Parents Ass'n v. American Federation of State, County & Municipal Employees, 180 N.J. Super. 501, 503, 435 A.2d 855 (Ch. Div. 1981), holding parents' association lacked "standing to intervene in a labor dispute between employees ... and the governmental entity responsible for the school's operation"); State v. Jan-Mar, Inc., 210 N.J. Super. 236, 240-41, 509 A.2d 310 (Law Div. 1985) (holding that option holder lacked "standing to intervene" in condemnation action, and relying on N.J. Zinc ), aff'd in part on other grounds, 236 N.J. Super. 28, 563 A.2d 1153 (App. Div. 1989).
Rule 4:33-1 tracks the language of Fed. R. Civ. P. 24(a)(2) verbatim. Allstate N.J. Ins. Co. v. Neurology Pain Assocs., 418 N.J. Super. 246, 254, 13 A.3d 390 (App. Div. 2011) ; Pressler & Verniero, cmt. 1 on R. 4:33-1. The federal rule and our Rule mandate intervention if the intervenor's status is comparable to that of a party that must be mandatorily joined in the action by the court, with the additional requirement that the party's interest is not otherwise adequately represented by existing parties. Ibid. Compare Fed. R. Civ. P. 19(a)(1)(B)(i) (requiring joinder "if ... th[e] person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may ... as a practical matter impair or imped the person's ability to protect the interest"), and the nearly identical language of R. 4:28-1(a)(2)(i) (requiring joinder "if ... the person claims an interest in the subject of the action and is so situated that the disposition of the action in the person's absence may ... as a practical matter impair or impede the person's ability to protect that interest"), with Fed. R. Civ. P. 24(a)(2) (stating for "Intervention of Right ... the court must permit anyone to intervene who ... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede *289 the movant's ability to protect its interest"), and the nearly identical language of R. 4:33-1 (mandating intervention "if the applicant claims an interest relating to the property or transaction which is the subject of the action and is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest").
In other words, a court must grant intervention if the putative intervenor is on the same footing as someone the court must otherwise "join[ ] as a party to the action." R. 4:28-1(a). As one federal court explained, "[t]he only difference between intervention of right under [the analogous federal rule] and joinder under [the analogous federal rule] is which party initiates the addition of a new party to the case."
*267 New York State Ass'n for Retarded Children, Inc. v. Carey, 438 F.Supp. 440, 445 (E.D.N.Y. 1977). It is, therefore, entirely understandable our courts routinely recognize that a successful intervenor is a party to the litigation. Williams v. State, 375 N.J. Super. 485, 530, 868 A.2d 1034 (App. Div. 2005), aff'd sub nom. In re P.L. 2001, Chapter 362, 186 N.J. 368, 895 A.2d 1128 (2006).
In 1986, the United States Supreme Court noted in Diamond v. Charles, 476 U.S. 54, 68 n.21, 106 S.Ct. 1697, 90 L.Ed.2d 48 (1986), that "[t]he Courts of Appeals have reached varying conclusions as to whether a party seeking to intervene as of right must himself possess standing." Compare Brennan v. N.Y. City Bd. of Educ., 260 F.3d 123, 131 (2d Cir. 2001) ("[W]here a proposed intervenor's interests are otherwise unrepresented in an action, the standard for intervention is no more burdensome than the standing requirement."), Wade v. Goldschmidt, 673 F.2d 182, 185 n.5 (7th Cir. 1982) (A proposed intervenor must demonstrate a direct, significant and legally protectable interest in the property at issue in the law suit. The interest "must be based on a right which belongs to the proposed intervenor rather than to an existing party in the suit.") (emphasis added), and Solien v. Miscellaneous Drivers & Helpers Union, 440 F.2d 124, 132 (8th Cir. 1971) ("Intervention as of right presupposes that the applicant has a right to maintain a *290 claim for the relief sought"), with United States v. Imperial Irrigation Dist., 559 F.2d 509, 521 (9th Cir. 1977) ("A party seeking to intervene pursuant to [Fed. R. Civ. P.] 24... need not possess the standing necessary to initiate the lawsuit."), rev'd and vacated on other grounds, 447 U.S. 352, 100 S.Ct. 2232, 65 L.Ed.2d 184 (1980). However, in June 2017, the Supreme Court definitively stated in Town of Chester v. Laroe Estates, Inc., 581 U.S. ----, 137 S.Ct. 1645, 1651, 198 L.Ed.2d 64 (2017), "an intervenor of right must have Article III standing in order to pursue relief that is different from that which is sought by a party with standing."
We are not, of course, bound by this federal precedent, but we find it persuasive, given the nearly verbatim equivalency between our Rules and their source, the Federal Rules of Civil Procedure. Moreover, the core concepts contained in Rule 4:33-1 governing intervention as of right-the movant must have an "interest" in the "subject of the action," which may be "impair[ed] or impede[d]" without intervention-find equal voice in our standing jurisprudence. See, e.g., In re Camden Cty., 170 N.J. 439, 449, 790 A.2d 158 (2002) (holding, to have standing, "a party must present a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision.").
Further, for the reasons already stated, based upon the express language of Rules 4:33-2 and 4:33-3, we conclude that in deciding whether to permit intervention, the court should consider if the intervenor has standing in its own right to assert a claim or defense that presents a "common" "question of law or fact" with the pending action.
As we discuss more fully below, our standing jurisprudence has always evidenced "an approach that is less rigorous than the federal standing requirements." Camden Cty., 170 N.J. at 448, 790 A.2d 158 (citing Crescent Park Tenants Ass'n v. Realty Equities Corp. of N.Y., 58 N.J. 98, 107-08, 275 A.2d 433 (1971) ("Unlike the Federal Constitution, there is no express language in New Jersey's *291 Constitution [confining] our judicial power to actual cases and controversies.") ). Nevertheless, we conclude that intervention at trial as of *268 right or by permission of the court is premised upon the putative intervenor's demonstrating that he or she has standing either in the action in chief-which essentially compels a court to grant a timely motion for intervention as of right pursuant to Rule 4:33-1, unless the intervenor's interests are otherwise adequately protected-or to bring an independent action-in which the putative intervenor's "claim or defense" involves a question of "law or fact" common to the pending action, R. 4:33-2.
B.
The concept of standing in a legal proceeding refers to a litigant's "ability or entitlement to maintain an action before the court." People for Open Gov't v. Roberts, 397 N.J. Super. 502, 508-09, 938 A.2d 158 (App. Div. 2008) (quoting Triffin v. Somerset Valley Bank, 343 N.J. Super. 73, 80, 777 A.2d 993 (App. Div. 2001) ). Whether a party has standing is "a threshold justiciability determination," In re Six Month Extension of N.J.A.C. 5:91-1 et seq., 372 N.J. Super. 61, 85, 855 A.2d 582 (App. Div. 2004), neither subject to waiver nor conferrable by consent. In re Adoption of Baby T., 160 N.J. 332, 341, 734 A.2d 304 (1999). "[A] lack of standing ... precludes a court from entertaining any of the substantive issues for determination." EnviroFinance Grp. v. Envtl. Barrier Co., 440 N.J. Super. 325, 339, 113 A.3d 775 (App. Div. 2015) (quoting Baby T., 160 N.J. at 340, 734 A.2d 304 ). We apply de novo review to the trial court's determinations regarding standing. NAACP of Camden Cty. E. v. Foulke Mgmt. Corp., 421 N.J. Super. 404, 444, 24 A.3d 777 (App. Div. 2011).
Our courts generally take a liberal view of standing, since, as noted, we are not confined by the "case or controversy" requirement of Article III, Section 2 of the United States Constitution. Camden Cty., 170 N.J. at 448-49, 790 A.2d 158 ; EnviroFinance, 440 N.J. Super. at 340, 113 A.3d 775 ; Loigman, 297 N.J. Super. at 294-95, 687 A.2d 1091. But, standing is not automatic.
*292 Bondi v. Citigroup, Inc., 423 N.J. Super. 377, 436, 32 A.3d 1158 (App. Div. 2011).
Judge Hogan concluded appellants lacked standing for purposes of intervention. He reasoned: (1) appellants were not entitled to bring a claim for NRD because the Spill Act only authorized DEP to bring such suits; (2) appellants could not utilize the private right of action provided by the Environmental Rights Act (ERA), N.J.S.A. 2A:35A-1 to -14, because the ERA provides only declaratory and injunctive relief, and appellants could not establish inaction or inadequate action by DEP; and (3) appellants' intervention motions were procedurally deficient under Rule 4:33-3 because they failed to state a claim.
i.
In 1991, the Legislature amended the Spill Act to provide a private right of action for contribution so that pollution dischargers could share the costs of remediation with additional dischargers not so designated by DEP, i.e., non-settling entities. Magic Petroleum Corp. v. Exxon Mobil Corp., 218 N.J. 390, 405, 95 A.3d 175 (2014) ; Hous. Auth. of New Brunswick v. Suydam Inv'rs, L.L.C., 177 N.J. 2, 18, 826 A.2d 673 (2003). The Spill Act "provides for two causes of action: one to recover clean-up costs from [other] dischargers (contribution claim), [N.J.S.A.] 58:10-23.11f(a)(2), and one to recover damages from the NJDEP, or Spill Compensation Fund, [N.J.S.A.] 58:10-23.11k." Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C., 655 F.Supp.2d 473, 503 (D.N.J. 2009). Appellants have not asserted a claim under either section.
*269 Except for the right to contribution, only DEP may recover cleanup costs and other damages from responsible parties under the Spill Act:
[A]ny person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred. Such person shall also be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs incurred by the [DEP] ....
[ N.J.S.A. 58:10-23.11g(c).]
*293 More importantly for purposes of this appeal, the Spill Act clearly provides that only DEP may sue to recover NRD.
[DEP ] may commence a civil action in Superior Court for, singly or in combination:
(1) a temporary or permanent injunction;
(2) the costs of any investigation, cleanup or removal ... ;
(3) the cost of restoring, repairing, or replacing real or personal property damaged or destroyed by a discharge ... and any reduction in value of the property caused by the discharge by comparison with its value prior thereto;
(4) the cost of restoration and replacement, where practicable, of any natural resource damaged or destroyed by a discharge; and
(5) any other costs incurred by the department.
[ N.J.S.A. 58:10-23.11u(b) (emphasis added).]
ii.
Both appellants seemingly accept that the Spill Act provides no private right of action for citizens to seek NRD from a polluter. The Environmental Groups argue, however, that they have standing under the ERA because of DEP's inadequate enforcement; that is, DEP's decision to settle the lawsuit under the terms of the consent order. They also contend they have standing pursuant to the common law. We disagree.
"The ERA creates a private cause of action for declaratory and injunctive relief to protect the environment against 'pollution, impairment and destruction.' " Patterson v. Vernon Twp. Council, 386 N.J. Super. 329, 330-31, 901 A.2d 411 (App. Div. 2006) (quoting N.J.S.A. 2A:35A-2 and -4). "The ERA ... grants a private person standing to enforce an environmental protection statute as an alternative to inaction by the government which retains primary prosecutorial responsibility. ERA does not itself provide any substantive cause of action." Superior Air Prods. Co. v. NL Indus., Inc., 216 N.J. Super. 46, 58, 522 A.2d 1025 (App. Div. 1987).
Beginning with our decision in Township of Howell v. Waste Disposal, Inc., 207 N.J. Super. 80, 98-9, 504 A.2d 19 (App. Div. 1986), we have recognized that the ERA grants a private citizen *294 standing to enforce environmental laws, including the Spill Act, as an alternative to inaction or inadequate action on the part of DEP. See, e.g., Morris Cty. Transfer Station, Inc. v. Frank's Sanitation Serv., Inc., 260 N.J. Super. 570, 577, 617 A.2d 291 (App. Div. 1992) (private plaintiff can use ERA to supplement government action); Port of Monmouth Dev. Corp. v. Middletown Twp., 229 N.J. Super. 445, 451, 551 A.2d 1030 (App. Div. 1988) (ERA action permitted when DEP failed to act effectively); Superior Air Prods., 216 N.J. Super. at 58-59, 522 A.2d 1025 (private cause of action may lie when agency inadequately enforces a statute). *270 There are, however, limits. DEP "must normally be free to determine what solution will best resolve a problem on a state or regional basis given its expertise and ability to view those problems and solutions broadly." Howell, 207 N.J. Super. at 95-96, 504 A.2d 19. Whether DEP's actions are adequate requires consideration of "the individual set of facts in each case." Id. at 95, 504 A.2d 19 ; see also Mayor & Council of Rockaway v. Klockner & Klockner, 811 F.Supp. 1039, 1055 (D.N.J. 1993) (whether government's efforts have been sufficient and whether ERA action can proceed are "fact-specific" questions).
Although Judge Hogan found appellants failed to demonstrate DEP's actions in this case were inadequate, a conclusion with which we agree, any private right of action under the ERA is limited to "injunctive or other equitable relief to compel compliance with a statute, regulation or ordinance, or to assess civil penalties for the violation as provided by law." N.J.S.A. 2A:35A-4(a) ; see also Bowen Eng'g v. Estate of Reeve, 799 F.Supp. 467, 479 (D.N.J. 1992) (noting private right of action "through ERA for injunctive relief under the Spill Act"). An action under the ERA may only be "commenced upon an allegation that a person is in violation, either continuously or intermittently, of a statute, regulation or ordinance, and that there is a likelihood that the violation will recur in the future." N.J.S.A. 2A:35A-4(a). The ERA does not provide, and none of the cases cited permit, a private party to sue a polluter to recover NRD under the Spill Act.
*295 In short, given the nature of this particular litigation, the ERA did not provide a path for the Environmental Groups or Lesniak to intervene at trial before Judge Hogan.[4] We therefore affirm the denial of appellants' motions to intervene at trial.
Moreover, even if we are wrong about the need to demonstrate standing in order to intervene at trial, any error in denying intervention in this case was not prejudicial and did not bring about an unjust result. R. 2:10-2. Appellants sought intervention solely to argue against the settlement. In granting both appellants' motions to file briefs and make argument as amici, Judge Hogan essentially permitted them to assert their claims as if they had intervened, and he considered fully the arguments they raised before approving the consent judgment. See Atl. Emp'rs Ins. Co. v. Tots & Toddlers Pre-School Day Care Ctr., Inc., 239 N.J. Super. 276, 281, 571 A.2d 300 (App. Div. 1990) (finding judge's denial of intervention to be harmless error because "[h]e did allow appellants to argue fully at the summary judgment hearing just as if they formally had been granted permission to intervene, and gave full consideration to their arguments").
II.
We come to what is the more difficult issue presented by these appeals. Judge Hogan's conclusion that appellants could not intervene to preserve a right to appeal is not entitled to any deference, because the trial court lacks authority to decide whether an appeal is cognizable in the Appellate Division and whether any *271 particular appellant is entitled to bring the appeal. See Prado v. State, 186 N.J. 413, 422-23, 895 A.2d 1154 (2006) (discussing *296 Appellate Division's exclusive authority to review agency action under R. 2:2-3(a)(2) even when there is a pending action in the Law Division); State v. A.L., 440 N.J. Super. 400, 418, 114 A.3d 365 (App. Div. 2015) (a party aggrieved by a judgment may appeal, and to be aggrieved, the party "must have a personal or pecuniary interest or property right adversely affected by the judgement") (quoting Howard Sav. Inst. v. Peep, 34 N.J. 494, 499, 170 A.2d 39 (1961) ).
Lesniak contends DEP's decision to settle the litigation is akin to any other agency action, and, therefore, reviewable as of right on appeal pursuant to Rule 2:2-3(a)(2). We disagree, only to the extent that we are not reviewing agency action in this case, but rather the consent judgment approved by Judge Hogan. However, although appellants could not intervene at trial because they had no standing to pursue the claims made in the lawsuit, we must now consider whether appellants may challenge the merits of Judge Hogan's approval of the settlement before this court.
We have considered the ability of a non-party to file an appeal challenging the judgment entered by the trial court in a variety of settings. "In the post-judgment setting, motions for intervention have received mixed treatment by our courts." Warner Co. v. Sutton, 270 N.J. Super. 658, 662, 637 A.2d 960 (App. Div. 1994). "Generally, intervention after judgment is allowed if necessary 'to preserve some right which cannot otherwise be protected.' " Ibid. (quoting Chesterbrooke Ltd. P'ship. v. Planning Bd. of Chester, 237 N.J. Super. 118, 123, 567 A.2d 221 (App. Div. 1989) ). Our decisions have tailored the standards of Rule 4:33-1 to the unique circumstances presented on appeal. Ibid. See Chesterbrooke, 237 N.J. Super. at 123, 567 A.2d 221.
Similarly, federal courts have been circumspect in granting intervention post-settlement. See, e.g., R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1 (1st Cir. 2009) (denying post-settlement intervention primarily on timeliness grounds); Farmland Dairies v. Comm'r of N.Y. Dep't of Agric. & Mkts., 847 F.2d 1038, 1044 (2nd Cir. 1988) (denying intervention to challenge *297 settlement after New York Attorney General decided not to appeal, and concluding settlement would be "jeopardized" by intervention); City of Bloomington v. Westinghouse Elec. Corp., 824 F.2d 531 (7th Cir. 1987) (affirming denial of intervention as untimely). However, when the settling party no long adequately represents the putative intervenor's interests, or where the party chooses not to appeal, the federal courts have been more accommodating. See, e.g., United Airlines, Inc. v. McDonald, 432 U.S. 385, 394, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977) (concluding post-settlement motion to intervene to appeal denial of class certification should have been granted because intervenor's interests were no longer protected by named class representatives).
Certainly, "[o]ur prior decisions have recognized the appropriateness of granting a party affected by a judgment leave to intervene to pursue an appeal if a party with a similar interest who actively litigated the case in the trial court has elected not to appeal." CFG Health Sys., L.L.C. v. Cty. of Essex, 411 N.J. Super. 378, 385, 986 A.2d 695 (App. Div. 2010). In CFG Health Systems, an unsuccessful bidder (CFG) sued the county and the successful bidder (CHS) seeking to set aside the award of a public contract. Id. at 381, 986 A.2d 695. The trial court concluded CHS's bid was defective and ordered the award of the contract to CFG. Ibid. The county and *272 CHS appealed, and we reversed, finding CFG's suit was premature. Id. at 381-82, 986 A.2d 695. The county then rejected all bids. Id. at 382, 986 A.2d 695.
CFG filed a new action, claiming the county's decision was arbitrary and capricious, and CHS's bid was fatally defective. Id. at 382-83, 986 A.2d 695. After granting CHS's motion to dismiss, the trial court ordered the county to award the contract to CFG. Id. at 383, 986 A.2d 695. The county originally filed an appeal, but later withdrew it; contemporaneously, CHS, no longer a party in the Law Division, moved before us to intervene to file an appeal. CFG opposed the motion. Ibid.
Before reaching the merits of the appeal and reversing, Judge Skillman wrote:
*298 Our grant of CHS's motion for intervention was directly supported by the principles set forth in Chesterbrooke. CHS's position in this litigation was the same as the County's position; that is, the County's decision to rebid the contract was reasonable and should be upheld. Thus, CHS's position was adequately represented before the Law Division by the County. However, once the County elected not to pursue an appeal from the judgment of the Law Division invalidating its resolutions, CHS's position was no longer adequately represented by the County. Therefore, we reaffirm our decision to grant CHS leave to intervene in order to pursue this appeal.
[ Id. at 385-86, 986 A.2d 695.]
Likewise, in Chesterbrooke, 237 N.J. Super. at 124-26, 567 A.2d 221, we concluded that objectors who owned property adjacent to a proposed development should be allowed to intervene for purposes of appealing the trial court's decision overturning the planning board's denial of development approvals, even though the board elected not to pursue an appeal. In SMB Associates v. New Jersey Department of Environmental Protection, 264 N.J. Super. 38, 43, 624 A.2d 14 (App. Div. 1993), aff'd, 137 N.J. 58, 644 A.2d 558 (1994), DEP choose not to appeal the grant of a development waiver by the Coastal Area Review Board (CARB), even though the Commissioner opposed the waiver. We specifically rejected a claim by the developer that public interest environmental groups lacked standing to appeal and reversed the waiver. Id. at 44, 61, 624 A.2d 14.
We have also recognized a party's right to file an appeal following settlement in the trial court. Warner presented facts that are somewhat similar to this case. There, the appellant environmental groups sought intervention to appeal a settlement reached between a mining company and the local planning board. Warner, 270 N.J. Super. at 660-61, 637 A.2d 960. Following our remand, the trial judge denied intervention, concluding appellants' application was untimely. Id. at 662, 637 A.2d 960. We reversed and remanded, concluding intervention was timely, particularly since the consent order settling the case "raise[d] a host of new issues which did not exist prior to its entry." Id. at 666, 637 A.2d 960 (emphasis added).
*299 In Meehan, 317 N.J. Super. at 570-71, 722 A.2d 938, we reversed the trial court and recognized an adjacent property owner's right to intervene after settlement between a developer and another objector because no party represented the intervenor's interests any longer. We limited intervention "to challenging the appropriateness of the settlement." Id. at 565, 722 A.2d 938.
We have also considered appeals brought by individuals and public interest groups that challenged settlements between DEP and others. See, e.g., *273 Pinelands Pres. All. v. State, Dep't of Envtl. Prot., 436 N.J. Super. 510, 95 A.3d 741 (App. Div. 2014) ; Dragon v. N.J. Dep't of Envtl. Prot., 405 N.J. Super. 478, 965 A.2d 209 (App. Div. 2009) ; In re N.J. Pinelands Comm'n Resolution, 356 N.J. Super. 363, 812 A.2d 1113 (App. Div. 2003).
Exxon argues appellants have no standing to appeal because they were not parties in the trial before Judge Hogan. Certainly, some of our opinions have implicitly or explicitly recognized that the intervenor-appellant had standing to pursue the claim in the trial court before bringing the appeal. See CFG, 411 N.J. Super. at 381-85, 986 A.2d 695 (intervenor-appellant was once a party to the suit); Warner, 270 N.J. Super. at 664 n.1, 637 A.2d 960. (recognizing intervenor-appellant could have filed a direct action challenging the settlement); Chesterbrooke, 237 N.J. Super. at 124, 567 A.2d 221 (recognizing objectors' rights to have intervened at trial).
However, we have not necessarily preconditioned the right to appeal upon participation in the prior proceeding. SMB Assocs., 264 N.J. Super. at 44, 624 A.2d 14 (rejecting challenge to standing "because appellants did not participate below and were not parties in any of the proceedings below"). See also Ocean Cty. Chapter Inc. of Izaak Walton League of Am. v. Dep't of Envtl. Prot., 303 N.J. Super. 1, 11, 696 A.2d 25 (App. Div. 1997) (assuming without deciding appellant had standing to appeal even though it chose not to participate in administrative proceedings prior to DEP settlement). As the Court said in Elizabeth Federal Savings & Loan Ass'n v. Howell, 24 N.J. 488, 499-500, 132 A.2d 779 (1957)
*300 [T]his right to seek judicial review of administrative decisions inheres not only in those who are direct parties to the initial proceedings before an administrative agency ... but also belongs to all persons who are directly affected by and aggrieved as a result of the particular action sought to be brought before the courts for review.
Indeed, in its per curiam opinion affirming our judgment in SMB Associates, the Court concluded that the American Littoral Society (ALS) had standing to appeal CARB's final decision even though it had not participated in the agency proceedings.
The policy choice between the desire to have a manageable administrative hearing process (without a proliferation of parties) and the public interest in not having non-party objectors raise issues in judicial appeals that might better be resolved in the agency process is difficult. This case is atypical in that the position of the primary regulator (DEPE) in the administrative hearing was at variance with that of the final review body (CARB). ALS argues that it could not have foreseen that existing DEPE policy would not be applied to the case under review. ALS did not lay back to sandbag its opponents later. Thus, although our dissenting colleague makes an excellent argument that notions of fundamental fairness and exhaustion of administrative remedies should preclude sophisticated third-party objectors from intervening in litigation after observing its progress for several years, this is not the case for application of those principles. These facts are much too unusual to deny ALS standing to appeal, even though ALS should have made its position known earlier in the administrative process. Under the circumstances, the Appellate Division did not err in concluding that ALS, as an association concerned with the preservation of our coastal resources, had sufficient interests in the water-dependent development issues of this case to appeal the CARB action under Rule 2:2-3(a)(2).
*274 [ SMB Assocs., 137 N.J. at 61-62, 644 A.2d 558.]
We therefore reject Exxon's argument.
DEP acknowledges that a party may challenge settlements under the Spill Act, but only if the challenger can independently assert standing. It contends that Lesniak's interests, as a resident of Elizabeth and legislator for that district, fail to provide him with standing. DEP argues that the Environmental Groups lack standing to appeal for some of the same reasons that prevented their intervention before Judge Hogan, noting no court has permitted a private third party to challenge an NRD settlement on appeal because private parties cannot sue for NRD under the Spill Act. It also argues that the Environmental Groups cannot appeal because DEP has adequately represented their interests throughout the litigation, including settlement of the lawsuit.
*301 However, in Salorio v. Glaser, 82 N.J. 482, 491, 414 A.2d 943 (1980), the Court declared: "We have consistently held that in cases of great public interest, any 'slight additional private interest' will be sufficient to afford standing." See SMB Assocs., 264 N.J. Super. at 46, 624 A.2d 14 ("Our courts have held that a 'slight private interest, added to and harmonizing with the public interest,' is sufficient to give standing to seek judicial review of official action.") (quoting Elizabeth Fed., 24 N.J. at 499, 132 A.2d 779 ). See also In re Tax Credit Application of Pennrose Props., Inc., 346 N.J. Super. 479, 482, 788 A.2d 787 (App. Div. 2002) ("While we find that the standing issue is certainly debatable, we prefer, given the public interest in a matter such as this, to resolve the issue on its substantive merits."). In particular, we have expanded standing to appeal agency action when it is likely that no one can or will assert the public's opposing interests. See In re Waterfront Dev. Permit, 244 N.J. Super. 426, 438, 582 A.2d 1018 (App. Div. 1990) (permitting public interest environmental group to challenge DEP's actions in granting development permit when it was unlikely that local residents and others would).
We conclude Lesniak lacks standing to pursue this appeal. We agree with DEP that he lacks a sufficient "personal or pecuniary interest or property right adversely affected by the judgement." A.L., 440 N.J. Super. at 418, 114 A.3d 365. We therefore affirm in A-0668-15.
We conclude, however, the Environmental Groups do have standing to appeal, based upon their broad representation of citizen interests throughout this state. We disagree with DEP that the Environmental Groups have no standing to appeal because DEP shares the same objectives they do, and the agency continues to adequately represent the groups' interests.
We recognize DEP's preeminent position as the agency designated by the Legislature to "formulate comprehensive policies for the conservation of the natural resources of the State, the promotion of environmental protection and the prevention of pollution of the environment of the State." N.J.S.A. 13:1D-9. We *302 further acknowledge that the choice to settle litigation rests largely within an agency's discretion, and we generally defer to that choice "so long as it 'is responsive to the purpose and function of the agency.' " Dragon, 405 N.J. Super. at 492-93, 965 A.2d 209 (quoting Texter v. Dep't of Human Servs., 88 N.J. 376, 385-86, 443 A.2d 178 (1982) ). However, as we already noted, those general principles do not automatically eliminate all challenges to DEP's decision to settle a dispute.
Although we agree private actors cannot sue for NRD, the Legislature amended the Spill Act by enacting *275 N.J.S.A. 58:10-23.11e2 in 2005. That section provides DEP,
prior to its agreement to any administrative or judicially approved settlement entered into pursuant to [the Spill Act], ... shall publish in the New Jersey Register and on the New Jersey Department of Environmental Protection's website the name of the case, the names of the parties to the settlement, the location of the property on which the discharge occurred, and a summary of the terms of the settlement, including the amount of any monetary payments made or to be made. The Department of Environmental Protection shall provide written notice of the settlement, which shall include the information listed above, to all other parties in the case and to any other potentially responsible parties of whom the department has notice at the time of the publication.
[Ibid. (emphasis added).]
We note that this section was enacted at the same time N.J.S.A. 58:10-23.11f(a)(2)(b) was added to the Spill Act, Cumberland Farms, 447 N.J. Super. at 429-430, 148 A.3d 767, which shields settling polluters from contribution claims made by other polluters and at the same time provides non-settling polluters with pro tanto credit for the amount of the settlement DEP reaches with the settling polluter. DEP's obligation to provide written notice of the settlement to "all other parties in the case and to any other potentially responsible parties of whom the department has notice," N.J.S.A. 58:10-23.11e2 (emphasis added), furthers the Legislature's obvious purpose and is consistent with DEP's position that only parties, or other polluters who might intervene, may challenge a court approved Spill Act settlement.
However, the statute's legislative history does not elucidate the Legislature's purpose in also requiring DEP to furnish a separate public notice of the court settlement. As we have noted, "[e]ven *303 prior to the enactment of N.J.S.A. 58:10-23.11e2, ... the settlement agreements negotiated between the DEP and responsible parties included provisions requiring the publication of public notice in the New Jersey Register of a settlement agreement, even if it was already signed." Cumberland Farms, 447 N.J. Super. at 430, 148 A.3d 767 (emphasis added). Because the Legislature required public notice, in addition to the written notice DEP must provide to all parties and possible parties of which the agency is aware, we doubt the Legislature intended notice and comment would immunize DEP from all challenges to its ultimate decision to settle litigation brought in the trial courts of this State under the Spill Act.
We therefore conclude the Environmental Groups have standing to appeal Judge Hogan's decision approving the consent judgment. We now turn to that issue.
III.
Our cases have long recognized the necessity of holding a judicial hearing to approve a settlement in a variety of situations when significant public interests are involved. Courts have taken this approach when reviewing settlements of: land use litigation, see Friends of Peapack-Gladstone v. Borough of Peapack-Gladstone Land Use Board, 407 N.J. Super. 404, 971 A.2d 449 (App. Div. 2009) ; Gandolfi v. Town of Hammonton, 367 N.J. Super. 527, 843 A.2d 1175 (App. Div. 2004) ; Warner Co. v. Sutton, 274 N.J. Super. 464, 644 A.2d 656 (App. Div. 1994) ( Warner II ); exclusionary zoning suits, see Livingston Builders, Inc. v. Township of Livingston, 309 N.J. Super. 370, 707 A.2d 186 (App. Div. 1998) ; and litigation over utility connection fees, see *276 Builders League of South Jersey, Inc. v. Gloucester County Utilities Authority, 386 N.J. Super. 462, 902 A.2d 253 (App. Div. 2006).
In Warner II, 274 N.J. Super. at 480, 644 A.2d 656, we recognized "no court rule or other Supreme Court guidance as to the parameters of such a fairness hearing." However, as Judge Skillman wrote when sitting as a trial judge:
*304 The hearing on the proposed settlement is not a plenary trial and the court's approval of the settlement is not an adjudication of the merits of the case. Rather, it is the court's responsibility to determine, based upon the relative strengths and weaknesses of the parties' positions, whether the settlement is "fair and reasonable," that is, whether it adequately protects the interests of the persons on whose behalf the action was brought.
[ Morris Cty. Fair Hous. Council v. Boonton Twp., 197 N.J. Super. 359, 370, 484 A.2d 1302 (Law Div. 1984) (citations omitted), aff'd o.b., 209 N.J. Super. 108, 506 A.2d 1284 (App. Div 1986).]
We might add one further standard, although it seems implicit from Judge Skillman's description. The judge conducting the fairness hearing must conclude that the settlement does not exceed the legal authority of the public entity. See, e.g., Warner II, 274 N.J. Super. at 483-84, 644 A.2d 656 (reversing approval of settlement because it exceeded powers of land use board).
In his written decision approving the settlement, Judge Hogan recognized that none of our state court decisions had addressed the applicable standard for his review of the proposed settlement. He analogized to the standard employed by federal courts in reviewing CERCLA settlements, citing New Jersey Department of Environmental Protection v. Atlantic Richfield Co., 33 F.Supp.3d 259, 264-65 (S.D.N.Y. 2014). There, the court recognized CERCLA was the "federal analogue to the Spill Act." Id. at 264 (quoting N.J. Dep't of Envtl. Prot. v. Dimant, 418 N.J. Super. 530, 542, 14 A.3d 780 (App. Div. 2011), aff'd as modified, 212 N.J. 153, 51 A.3d 816 (2012) ). Under CERCLA, "[a] court should approve a consent decree if it is fair, reasonable, and consistent with CERCLA's goals." Id. at 265 (quoting In re Tutu Water Wells CERCLA Litig., 326 F.3d 201, 207 (3d Cir. 2003) ). Judge Hogan added he must also determine if the proposed settlement was "in the public interest."
Judge Hogan extensively reviewed the history of the litigation, including prior settlement demands and offers. He carefully examined DEP's estimates of NRD for the Attachment C facilities and the retail gas stations included in the consent judgment, and the arguments raised by the Environmental Groups regarding those *305 estimates.[5] He extensively reviewed the testimony from trial. In short, Judge Hogan concluded DEP's decisions, including whether to prosecute Spill Act claims at the facilities and stations, was "substantively fair" and not arbitrary, capricious and unreasonable.
Judge Hogan rejected any argument that DEP lacked authority to settle claims beyond the original pleadings. He reasoned the court had jurisdiction over Spill Act claims, and the consent judgment was "within the general scope of the case made out by the pleadings" and furthered the goals of the Spill Act. The judge summarized:
*277 After years of litigation and negotiations, [DEP] and [Exxon] have resolved their disputes and potential disputes over Bayway, Bayonne, Paulsboro, fifteen other Attachment C Facilities, and 1768 Retail Gas Stations. Through the approval of the Proposed Consent Judgment, the DEP will recover $225 million for alleged natural resource damages, while still retaining their right to refile their Surface Water Claims and pursue MTBE pollution allegedly caused by Exxon. In reaching this result, the court finds that the DEP applied rational methods in order to estimate total damages and determine what a fair payment would be for those damages. Although far smaller than the estimated $8.9 billion in damages, Exxon's payment represents a reasonable compromise given the substantial litigation risks the DEP faced at trial and would face on appeal. Furthermore, the Consent Judgment is faithful to the Spill Act's goals and in the public interest.
The Environmental Groups make several arguments. They contend the amount Exxon paid is not reasonable based on DEP's experts' estimate of damages, and the judge did not properly consider the relative strength of the parties' litigation positions. They also argue Judge Hogan lacked jurisdiction, and DEP lacked authority, to settle CERCLA claims. The Environmental Groups further contend the consent judgment violates the Spill Act and CERCLA because it does not direct all recovered funds to be used for the remediation and restoration of natural resources.
We found no New Jersey decision that defines our standard for reviewing Judge Hogan's approval of the settlement following the hearing. Clearly, since Judge Hogan conducted the trial, heard the *306 testimony and observed the witnesses, we should defer to his fact-finding and review of the evidence. See, e.g., Twp. of W. Windsor v. Nierenberg, 150 N.J. 111, 132, 695 A.2d 1344 (1997) (noting a judge in non-jury trial has the best "opportunity to hear and see the witnesses and to get a 'feel' for the case that the reviewing court [cannot] enjoy").[6] As it relates to Judge Hogan's evaluation of the evidence and its relationship to the settlement positions of the parties, our review is even more circumscribed.
The Environmental Groups and DEP both argue we should look to federal decisions regarding appellate review by circuit courts of district courts' approvals of CERCLA settlements. In one such case, the Third Circuit said:
Appellate review, therefore, is "encased in a double layer of swaddling." First, there is deference to the administrative agencies' input during consent decree negotiations and the law's policy of encouraging settlement. Where the appropriate agency has reviewed the record and has made a reasonable determination of fault and damages, that determination is owed some deference. Second, there is deference accorded the District Court under an abuse of discretion standard.
[ Tutu Wells, 326 F.3d at 207 (quoting United States v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990) (internal citations omitted) ).]
Accord United States v. George A. Whiting Paper Co., 644 F.3d 368, 372 (7th Cir. 2011). The trial court's discretion should not be overturned unless the objectors "bear [the] 'heavy burden' " and "demonstrate *278 the court committed a material error of law or a 'meaningful error in judgment.' " Ibid. (quoting Cannons Eng'g, 899 F.2d at 84 ).
Here, Judge Hogan presided over an extended trial and the post-trial proceedings. He heard all the witnesses and considered all of the parties' arguments and submissions, including the issues raised by appellants, during his review of the proposed consent judgment. Judge Hogan had the best opportunity to gauge the strength of the experts' estimates regarding NRD, the relative *307 strength of the parties' litigation positions, and whether any more specific analyses of the additional sites included in the proposed consent judgment were needed in order to evaluate the settlement. We find no mistaken exercise of the judge's discretion in finding the consent judgment was fair, reasonable, consistent with the Spill Act's goals, and in the public interest.
We lastly consider whether Judge Hogan committed a "material error of law" because (1) the court lacked jurisdiction, or DEP lacked authority, to release Exxon from CERCLA exposure, or (2) the consent order did not specifically limit redirection of the settlement funds away from the Spill Act Fund and remediation and restoration of natural resources in the State.
We agree with DEP that the agency does not need authority from the federal Environmental Protection Agency to decline prosecution of an environmental claim. None of the cases cited by the Environmental Groups supports their argument that DEP could not include as part of the consent judgment its intention to release Exxon from any CERCLA claims. The effect of the consent judgment upon possible unasserted claims of other parties is simply not before us.
DEP argues the Spill Act does not compel that all monies recovered by DEP be deposited in the Spill Act Fund. It cites other statutory provisions where the Legislature specifically required monies the agency recovered be deposited in specific funds. See, e.g., N.J.S.A. 58:10A-14.4 (requiring "all monies from penalties, fines, or recoveries of costs or improper economic benefits collected by the department" under the Water Pollution Control Act, N.J.S.A. 58:10A-1 to -14.6, to be deposited in the Clean Water Enforcement Fund). The Spill Act contains no such language.
Under the Appropriations Clause of the New Jersey Constitution, N.J. Const. art. VIII, § 2, ¶ 2, the power and authority to appropriate funds is vested in the Legislature. Burgos v. State, 222 N.J. 175, 205-06, 118 A.3d 270 (2015), cert. denied, *308 577 U.S. ----, 136 S.Ct. 1156, 194 L.Ed.2d 174 (2016). The Judiciary has no authority for any role in the budgetary process. Id. at 207, 118 A.3d 270. Although the Environmental Groups assert a laudable goal, we find no authority prohibiting the transfer of the settlement proceeds or limiting their use, nor any authority that permits this court to wade into the budgetary waters.[7] *279 Affirmed in A-0668-15; affirmed in A-0810-15.

The parties have not supplied full trial transcripts, see Rule 2:5-3(b), nor have they sought abbreviation of the transcripts pursuant to Rule 2:5-3(c). This deficiency has no impact on our review of the legal arguments raised, because they do not involve Judge Hogan's trial rulings or the actual evidence presented. But see Cipala v. Lincoln Tech. Inst., 179 N.J. 45, 55, 843 A.2d 1069 (2004) (affirming our refusal to address an issue because appellant did not provide the complete transcript, thereby "prohibit[ing] review" of claims advanced on appeal). We rely on the judge's description of the trial proceedings and post-trial events as contained in his written decisions.

According to DEP, MTBE, used in gasoline, is highly soluble, migrates long distances very quickly, does not degrade readily and, at sites where MTBE has been discharged, represents, in relation to other hazardous substances, the greatest extent of groundwater plumes.

Although not contained in the consent judgment, Judge Hogan noted in his written opinion that "Exxon entered into ACOs for the Attachment C Facilities and Retail Gas Stations."

In their brief, the Environmental Groups argue that they had standing through the ERA under the "common law." The judge rejected this claim, concluding that both appellants could not bring a common law claim because they lacked an "ownership interest" in the polluted sites and their proposed complaints in intervention, filed pursuant to Rule 4:33-3, never included such a cause of action. Only Lesniak's complaint is in the appellate record, and it asserts no common law claim or claim under the ERA.

DEP made its non-privileged files on the Attachment C facilities available to the public for inspection.

As already noted, we do not have the transcripts of the trial itself. However, the Environmental Groups do not argue Judge Hogan's factual determinations were unsupported by the evidence, but rather, they challenge his assessment of that evidence.

The voters approved an amendment to our Constitution in November 2017 which prospectively addresses the Environmental Groups' concerns. Article VIII, Section II, paragraph 9, effective December 7, 2017, provides:
There shall be credited annually to a special account in the General Fund an amount equivalent to the revenue annually derived from all settlements and judicial and administrative awards relating to natural resource damages collected by the State in connection with claims based on environmental contamination.
The amount annually credited pursuant to this paragraph shall be dedicated, and shall be appropriated from time to time by the Legislature, for paying for costs incurred by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, or for paying the legal or other costs incurred by the State to pursue settlements and judicial and administrative awards relating to natural resource damages. The first priority for the use of any moneys by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, pursuant to this paragraph shall be in the immediate area in which the damage to the natural resources occurred in connection with the claim for which the moneys were recovered. If no reasonable project is available to satisfy the first priority for the use of the moneys, or there are moneys available after satisfying the first priority for their use, the second priority for the use of any moneys by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, pursuant to this paragraph shall be in the same water region in which the damage to the natural resources occurred in connection with the claim for which the moneys were recovered. If no reasonable project is available to satisfy the first or second priority for the use of the moneys, or there are moneys available after satisfying the first or second priority for their use, the moneys may be used by the State to repair, restore, or replace damaged or lost natural resources of the State, or permanently protect the natural resources of the State, pursuant to this paragraph without geographic constraints. Up to 10 percent of the moneys appropriated pursuant to this paragraph may be expended for administrative costs of the State or its departments, agencies, or authorities for the purposes authorized in this paragraph.