**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3293-16T1

IN THE MATTER OF NEW
JERSEY DEPARTMENT OF
ENVIRONMENTAL PROTECTION
CAFRA PERMIT NO. 0000-15-0007.1
CAF 150001 AND FRESHWATER
WETLANDS PROTECTION ACT
PERMIT NO. 0000-15-0007.1
FWW 15001 ISSUED TO NEW
JERSEY NATURAL GAS.

_____

Submitted March 27, 2019 – Decided July 22, 2019

Before Judges Fuentes, Vernoia and Moynihan.

On appeal from permits issued by the New Jersey Department of Environmental Protection, Nos. 0000-15-0007.1 CAF 150001 and 0000-15-0007.1 FWW 15001.

Potter and Dickson, attorneys for appellants People Over Pipelines, Inc., Agnes Marsala, Rita Romeu, Glen Ashton, Katherine Marlin and Michael Marlin (R. William Potter, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent New Jersey Department of Environmental Protection (Jason W. Rockwell, Assistant Attorney

General, of counsel; Bruce A. Velzy, Deputy Attorney General, on the brief).

Riker, Danzig, Scherer, Hyland & Perretti LLP, attorneys for respondent-intervenor New Jersey Natural Gas Company (Dennis J. Krumholz, of counsel and on the brief; Laurie J. Sands and Michael S. Kettler, on the brief).

PER CURIAM

Appellants Agnes Marsala, Rita Romeu, Glen Ashton, Katherine Marlin, Michael Marlin, all individually, and People Over Pipelines, Inc. (POP) challenge the issuance of a joint permit by the New Jersey Department of Environmental Protection (the Department) under the Coastal Area Facility Review Act (CAFRA), N.J.S.A. 13:19-1 to -21, and the Freshwater Wetlands Protection Act (FWPA), N.J.S.A. 13:9B-1 to -30, authorizing intervenor New Jersey Natural Gas Company (NJ Gas) to install a .68 mile long portion of a thirty-mile natural gas transmission pipeline (SRL), which would cause "the permanent disturbance of 0.021 acres of freshwater wetlands and 0.170 acres of freshwater wetland transition area, and temporary disturbance of 0.378 acres of freshwater wetlands and 5.54 acres of freshwater wetland transition area."

Appellants in their merits brief assert:

Point I

The [Department] Failed To Identify Sufficient Facts In The Record Supporting The CAFRA Permit Granted To [NJ Gas] For A Segment Of The SRL Pipeline Project.

Point II

The CAFRA Criteria For Issuance Of A Permit Have Not Been Met By The Facts Of Record.

Point III

The [Response To Public Comments] Revealed Fatal Defects And Failed To Provide The Necessary Support To Sustain The [Department] Permits.

Point IV

The CAFRA Statute Requires Findings To Be Made By The Commissioner Of The [Department] And There Is Nothing In The Record To Show That [The Department Employee Who Prepared Those Findings] Was Properly Delegated The Required Statutory Authority.

The Department's determination, fairly supported by sufficient evidence in the record which we have closely reviewed, was not arbitrary, capricious or unreasonable. Consequently, we affirm.

We first address NJ Gas's challenge to appellants' standing. Typically, "[t]o possess standing in a case, a party must present a sufficient stake in the outcome of the litigation, a real adverseness with respect to the subject matter, and a substantial likelihood that the party will suffer harm in the event of an unfavorable decision." In re Camden County, 170 N.J. 439, 449 (2002). Under

New Jersey's liberal approach to standing, "owners of other properties in the vicinity of a property for which a permit or other land use approval has been granted may appeal the approval." In re Issuance of Access Conforming Lot Permit No. A-17-N-N040-2007, 417 N.J. Super. 115, 126 (App. Div. 2010). In a CAFRA case, all that is necessary is a "slight private interest, added to and harmonizing with the public interest." SMB Assocs. v. N.J. Dep't of Envtl. Prot., 264 N.J. Super. 38, 46 (1993) (quoting Elizabeth Fed. S & L Ass'n v. Howell, 24 N.J. 488, 499 (1957)), aff'd, 137 N.J. 58 (1994); see also N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 453 N.J. Super. 272, 301 (App. Div. 2018), certif. denied, 233 N.J. 378 (2018). We have explained

> the right to seek judicial review of administrative decisions "inheres not only in those who are direct parties to the initial proceedings before an administrative agency . . . but also belongs to all persons who are directly affected by and aggrieved as a result of the particular action sought to be brought before the courts for review."
>
> [SMB Assocs., 264 N.J. Super. at 46 (alteration in original) (quoting Elizabeth Fed. S & L Ass'n, 24 N.J. at 499-500).]

In SMB Associates, we concluded that the appellants – "a non-profit organization whose goal is to encourage the study and conservation of marine life and its habitat," the executive director of that non-profit group who

"personally use[d] the coastal waters of New Jersey for recreation," and a fisherman whose fishing waters were affected by the Department's decision – had standing, despite failing to participate in the public proceedings prior to the approval of CAFRA permits. Id. at 44-45, 47. We asked rhetorically, "if appellants do not have standing, 'who then is there who can or will challenge' the [agency action], thereby advancing the public interest?" Id. at 47 (quoting In re Waterfront Dev. Permit No. WD88-0443-1, Lincoln Harbor Final Dev., 244 N.J. Super. 426, 438 (App. Div. 1990)). Affirming our decision, the Supreme Court ruled "the Appellate Division did not err in concluding that [the non-profit group], as an association concerned with the preservation of our coastal resources, had sufficient interests in the water-dependent development issues of this case to appeal the [government] action under Rule 2:2-3(a)(2)."[1] SMB Assocs. v. N.J. Dep't of Envtl. Prot., 137 N.J. 58, 61-62 (1994). More recently, we held an environmental group had standing to challenge a settlement between the Department and Exxon because of "their broad representation of

---

[1] "[A]ppeals may be taken to the Appellate Division as of right . . . to review final decisions or actions of any state administrative agency or officer, and to review the validity of any rule promulgated by such agency or officer . . . ." R. 2:2-3(a)(2).

citizen interests throughout this state." Exxon Mobil Corp., 453 N.J. Super. at 301.

Under those standards, POP – which essentially argues the equitable relief of a remand to the Department is required because, in granting the permit, the Department took inadequate action to protect the environment – has standing. Rita Romeu, vice president of POP, commented at the public hearing that POP represents "the community members from Chesterfield, Bordentown, North Hanover, Upper Freehold, and other cities that are going to be affected by this." As such, POP's representation of people from various municipalities through which the pipeline will be constructed established its standing.[2] See Exxon Mobil Corp., 453 N.J. Super. at 294.

The standard for individual standing, however, is not as broad. In Exxon Mobil, we determined that although an environmental group had standing, the residency of a state senator who lived in a city adjacent to that in which the refinery in question was located did not provide him with standing because he lacked "a sufficient 'personal or pecuniary interest or property right adversely

_____

[2] The permit lists the project as affecting lots in Chesterfield, North Hanover, Plumstead, Upper Freehold, Jackson and Manchester.

A-3293-16T1

affected by the judgement.'" Id. at 301 (quoting State v. A.L., 440 N.J. Super. 400, 418 (App. Div. 2015)).

The burden of providing facts to establish standing is on appellants. See N.J. Shore Builders Ass'n v. Twp. of S. Brunswick, 325 N.J. Super. 412, 419-420 (App. Div. 1999). Our review of the record, which appellants have not moved to supplement, Rule 2:5-5(b), reveals: Agnes Marsala did not state where she resided, only that she had previously driven past the affected area; Rita Romeu noted that she was a resident of Chesterfield but, beyond her office in POP and her statement that she is a resident of Chesterfield, and unlike the executive director in SMB Associates, did not provide any facts to establish her personal, pecuniary or property interest that will be affected by the pipeline;[3] Glen Ashton did not state where he resides or his personal interest in the pipeline project; Katherine Marlin did not say where she resides; and Michael Marlin did not speak at any hearings and the record is bereft of any interest he has in the pipeline project. Thus the record before us is insufficient to establish standing for the individual appellants. Nevertheless, since POP has standing,

_____

[3] We note that when affirming our decision in SMB Associates, the Court expressly declined to address our determination that the executive director of the non-profit group had standing. 137 N.J. at 62. Given that our recent decision in Exxon Mobil examined personal interest when determining individual standing, 453 N.J. Super. at 301, we adhere to that analysis here.

we will address the merits of the appeal. We note that POP and the individual appellants advanced the same arguments in a joint merits brief. Our ruling that the individual appellants do not have standing, therefore, has no effect on our ultimate determination of this appeal.

We are unpersuaded by POP's arguments that the Department granted the permit without making requisite factual findings and that there is insufficient credible evidence in the record that the statutory CAFRA criteria were met. Our review of the permit and related twenty-six page environmental report and fourteen-page response to public comments belies POP's former argument which, itself, is a meager, bald assertion unsupported in the merits brief by any facts. The documents prepared by the Department adequately "set forth basic findings of fact, supported by the evidence and supporting the [Department's] ultimate conclusions and final determination," thus fulfilling its substantive responsibility to the public and the courts. In re Issuance of a Permit by Dep't of Envtl. Prot. to Ciba-Geigy Corp., 120 N.J. 164, 172-73 (1990) (quoting In re Application of Howard Savings Inst., 32 N.J. 29, 52 (1960)).

Those same documents evidence facts that supported the Department's grant of the CAFRA permit thus surmounting POP's latter argument.[4] "In our review of this administrative decision we are necessarily limited to a narrow function, namely, to determine whether there is sufficient evidence in the record as a whole to justify the determination reached below." Pub. Interest Research Grp., Inc. v. State, Dep't of Envtl. Prot., 152 N.J. Super. 191, 203 (App. Div. 1977). "Such a limited scope of review is particularly significant in this area of highly technical and scientific knowledge, wherein a court must accord a high degree of deference to the administrative agency and its expertise." Ibid.

"The Commissioner of the Department . . . may not issue a permit unless he finds that the statutory standards have been met." SMB Assocs., 264 N.J. Super. at 41. The Legislature requires the Department, before issuing a CAFRA permit, to find that the proposed development:

> a. Conforms with all applicable air, water and radiation emission and effluent standards and all applicable water quality criteria and air quality standards.
>
> b. Prevents air emissions and water effluents in excess of the existing dilution, assimilative, and recovery

---

[4] POP does not advance any argument in its merits brief challenging the substantive grounds for the Department's issuance of the FWPA permit. Nor does it argue that the mandated CAFRA regulatory criteria have not been met. It likewise does not challenge the permit conditions imposed by the Department.

capacities of the air and water environments at the site and within the surrounding region.

c. Provides for the collection and disposal of litter, recyclable material and solid waste in such a manner as to minimize adverse environmental effects and the threat to the public health, safety, and welfare.

d. Would result in minimal feasible impairment of the regenerative capacity of water aquifers or other ground or surface water supplies.

e. Would cause minimal feasible interference with the natural functioning of plant, animal, fish, and human life processes at the site and within the surrounding region.

f. Is located or constructed so as to neither endanger human life or property nor otherwise impair the public health, safety, and welfare.

g. Would result in minimal practicable degradation of unique or irreplaceable land types, historical or archeological areas, and existing public scenic attributes at the site and within the surrounding region.

[N.J.S.A. 13:19-10(a) to (g).]

In considering the 19-10 statutory criteria, the Department reviewed over 1800 public comments made during an extended comment period. It also received and reviewed agency comments from the United States Fish and Wildlife Service, New Jersey Division of Fish and Wildlife, New Jersey State Historical Preservation Office, the Department's Green Acres Program, the

Pinelands Commission, the Bureau of Water Allocation & Well Permitting, the Department's Site Remediation Program, the Division of Land Use Regulation (DLUR) Endangered and Threatened Species Unit (ETSU), the DLUR engineer, and the DLUR Mitigation Unit.

In addition to setting forth, in over nine single-spaced pages of its environmental report, its reasons for finding compliance or conditional compliance with the CAFRA regulatory scheme, the Department similarly addressed the N.J.S.A. 13:19-10 criteria; its findings are buttressed by its regulatory analysis as well as the agency's comments and responses to public comments.

In addressing the air and water quality criteria in subsections (a) and (b), the Department noted in its regulatory findings that "no stream crossings [were] proposed in the CAFRA zone" but protection against possible disturbance to contaminated soil or water in streams and tributaries within the watershed of Manapaqua Brook, which drains into a CAFRA zone and which will be crossed by the pipeline, required NJ Gas, to have a plan in place for identifying and managing contaminated material and to contact the Department Bureau of Site Remediation if it encountered contaminated material. Further, approved construction crossing streams, "utilizing either HDD [Horizontal Directional

Drill] methods, jack and bore or trenching under existing culverts," would allow those crossings to be made "without disturbing the surface characteristics." A November 29, 2016 letter to the Department written by AECOM on behalf of NJ Gas explained both these construction methods and other limitations of construction activity. AECOM also prepared a March 24, 2015 Horizontal Directional Drill Contingency Plan for Handling Inadvertent Releases of Drilling Mud and a compliance statement as part of the application process which details construction methods designed to meet the CAFRA statutory and regulatory requirements.

Air standards were also addressed. The only anticipated air emissions from the project were "temporary emissions of combustion-related pollutants" from construction equipment and "fugitive particulate matter" – earth related to excavation and construction activities – neither of which would have a significant impact on air quality. Nonetheless, the compliance statement details the mitigation measures NJ Gas will implement to reduce those emissions.

The Department, assessing subsection (c), reviewed NJ Gas's application and submissions. Although those documents did not reveal that the project would generate waste, the Department nonetheless included a standard condition

in the permit regarding waste management, removal and disposal: permit standard condition 22.

In addressing subsection (d), the Department considered that the project "is limited to installation of natural gas pipelines below ground level, and primarily within paved roads" and, therefore, concluded construction was not expected to intersect the aquifer or impair the "regenerative capacity of the water aquifers." The Department also relied on the comment by the Bureau of Water Allocation & Well Permitting in limiting the amount of water for construction dewatering and requiring the cessation of construction if amounts exceeded the thresholds in place.

The Department, utilizing recommended and required conditions – comprehensively synopsized in the environmental report – from the United States Fish and Wildlife Service, New Jersey Division of Fish and Wildlife and the DLUR ETSU regarding a number of detailed species inhabiting the proposed construction route, mandated extensive construction restrictions in its regulatory findings under N.J.A.C. 7:7-9.36 and its evaluation of subsection (e).

In assessing subsection (f), the Department again noted the project "is located primarily beneath existing paved roads and within the road [right-of-

ways] and will be constructed using best management practices,"[5] thus dangerous conditions to "human life or property, public health, safety and welfare" were not anticipated. The Department required, however, that conditions recommended by the Department's Site Remediation Program be implemented. As the environmental report related, the Program commented that the project would "traverse known contaminated sites as well as areas where potential unexploded ordnance has been identified on the Joint Base McGuire-Dix-Lakehurst," and required NJ Gas to "have a plan in place for identifying and managing contaminated soil, groundwater, surface water, and/or sediments encountered during construction and installation." It also required NJ Gas to coordinate construction activities with the Air Force. The Department echoed those requirements in its analysis of this subsection.

---

[5] N.J.A.C. 7:7a-1.3 provides:

> "Best Management Practices" or "BMPs" means methods, measures, designs, performance standards, maintenance procedures, and other management practices which prevent or reduce adverse impacts upon or pollution of freshwater wetlands, State open waters, and adjacent aquatic habitats, which facilitate compliance with [enumerated federal and state environmental laws] and effluent limitations or prohibitions under Section 307(a) of the Federal Act and the Department's Surface Water Quality Standards, N.J.A.C. 7:9B.

A-3293-16T1

The Department considered, in connection with subsection (g), extensive comments by the Historical Preservation Office, as fully set forth in the section of the environmental report regarding N.J.A.C. 7:7-9.34, and required NJ Gas to consult with the Office and comply with its requirements in order to minimize "practicable degradation of historic and archeological areas." As set forth more fully in the Department's analysis of N.J.A.C. 7:7-9.38 of the environmental report, the project would have minimal impact on Green Acres encumbered parcels, except for one parcel for which NJ Gas entered into a right of entry agreement. The Department also included a condition that required NJ Gas to obtain approval from the Green Acres Program if changed plans impacted Green Acres property.

The Department's documents, considered as a whole, evidence that the Department properly exercised its power under N.J.S.A. 13:19-10, and issued the permit after making "specific findings . . . regarding the development's impact on the environment." Crema v. N.J. Dep't of Envtl. Prot., 182 N.J. Super. 445, 453 (App. Div. 1982), aff'd as modified, 94 N.J. 286 (1983). The Department need not, contrary to POP's contention, respond to each individual criticism or concern raised by public comment or scrutinize all potential alternatives to an applicant's proposal. Nor does it need to address factors that

are not set forth in N.J.S.A. 13:19-10, including alleged impact of the project on global warming. It need only set forth, as it did here, its findings regarding the enumerated factors. We accord a high degree of deference to the Department's findings in light of its expertise in this "highly technical and scientific" field. Pub. Interest Research Grp., Inc., 152 N.J. Super. at 203. In that those findings were, as we delineated, supported by sufficient, credible evidence in the record, the Department's issuance of the permit was justified. Ibid.

POP also argues the freshwater wetlands component of NJ Gas's application was unlawfully segmented from a permit application submitted by Transco, another energy company, for construction of a natural gas valve station, gas meter and regulating station, gas compressor station, electrical substation, storm water management facilities, an office building, parking and a communications tower for its project, the Garden State Expansion (GSE), which would supply the gas that passed through NJ Gas's pipeline. POP contends both applications involved parts of single project and segmentation allowed NJ Gas to apply for a general permit instead of an individual permit,[6] preventing "a

---

[6] N.J.A.C. 7:7a-1.3 provides the definitions of these permits:

> "General permit" means a permit, adopted as a rule, under which the Department issues authorizations. A

comprehensive review of the cumulative primary and secondary impacts" of the combined projects. Citing Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402 (1971), it asserts segmentation fails the "independent utility" test. That test requires multiple projects to be considered the same project for permit purposes under the federal National Environmental Protection Act, 42 U.S.C. §§ 4321 to 4370m-12, "if the segmented project has no independent utility, no life of its own, or is simply illogical when viewed in isolation." Stewart Park & Reserve Coalition, Inc. v. Slater, 352 F.3d 545, 559 (2d. Cir. 2003).

The Department, however, does not utilize the independent utility test. Instead, it analyzes segmentation under its own regulatory provisions. Although POP argues the provision cited by the Department, N.J.A.C. 7:7A-7.1(c) (Oct. 6, 2008), was repealed after NJ Gas's application was approved on February 24,

---

general permit may authorize regulated activities in freshwater wetlands, State open waters, and/or transition areas. An authorization issued under a general permit satisfies the requirement for a freshwater wetlands permit, open water fill permit, and/or transition area waiver, as applicable.

. . . .

"Individual permit" means a freshwater wetlands permit or open water fill permit that is issued by the Department after an alternatives analysis and other site-specific and project-specific reviews required at N.J.A.C. 7:7A-10.

2017, and this appeal should consider the "readopted and amended" provision that became effective on December 18, 2017, N.J.A.C. 7:7A-10.1(c), we observe those provisions apply to FWPA individual permits, not general permits, the segmentation of which are analyzed under N.J.A.C. 7:7A-5.3(f).

In any event, all of the regulatory provisions provide that the permit, including any activity conducted thereunder, applies "to the entire site" upon which activities occur. N.J.A.C. 7:7A-5.3(f); N.J.A.C. 7:7A-7.1(c) (Oct. 6, 2008); N.J.A.C. 7:7A-10.1(c). And each regulation provides:

> [a]n applicant shall not segment a project or its impacts by applying for [a general permit] for one portion of the project and applying for an individual permit for another portion of the project. Similarly, an applicant shall not segment a project or its impacts by separately applying for [a separate permit] for different portions of the same project.
>
> [N.J.A.C. 7:7A-5.3(f); N.J.A.C. 7:7A-7.1(c) (Oct. 6, 2008); N.J.A.C. 7:7A-10.1(c).]

Giving "'great deference'" to an agency's "'interpretation of statutes within its scope of authority and its adoption of rules implementing' the laws for which it is responsible," N.J. Ass'n of Sch. Adm'rs v. Schundler, 211 N.J. 535, 549 (2012) (quoting N.J. Soc'y for Prevention of Cruelty to Animals v. N.J. Dep't of Agric., 196 N.J. 366, 385 (2008)), and focusing not on "whether the agency interpretation [of its regulations] is indisputably correct, but on whether it is not

plainly unreasonable," Ge Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 322 (1993), we determine the Department correctly ruled that the NJ Gas and Transco projects were discrete.

NJ Gas and Transco are separate entities and independently discretely applied for approval of their respective projects. Thus, they were not "an applicant" which was prohibited by the regulations from segmenting a project. Moreover, a "site" is "the area within the legal boundary of the property(ies) or right-of-way . . . upon which a regulated activity is proposed, is occurring, or has occurred, plus any contiguous land owned or controlled by the same person(s)." N.J.A.C. 7:7A-1.3 (emphasis added). The Department, in its response to public comments, set forth the basis for its decision that the projects were not segmented:

> The [NJ Gas] project primarily takes place in the right of ways of roads or on easements leased or purchased from property owners along the route. The roadways include municipal, County, State roads, as well as federal roads located on Joint Base [McGuire-Dix-Lakehurst]. The GSE compressor station and electrical substation in Chesterfield and Bordentown are proposed on two lots owned by Transco, within an easement to cross a PSEG right of way, and to cross a third property that is owned by Bordentown. The Bordentown parcel is Green Acres encumbered. Transco has initiated condemnation proceedings for an easement through the Bordentown property. With the exception of the pipe connection between the proposed

19

Transco GSE compressor and the proposed [NJ Gas] SRL pipeline in the roadway, the two project locations are not contiguous land owned or controlled by the same person(s).

Further, Transco and [NJ Gas] are not co-applicants for either project. Although the two projects are associated with transporting natural gas, the Transco project is regulated by the Federal Energy Regulatory Commission and the [NJ Gas] project is regulated by the NJ Board of Public Utilities.

In that the NJ Gas and Transco projects, except for the site of the necessary junction, are being built on separate, non-contiguous parcels not owned or controlled by the same entity, the Department's classification of the projects was not plainly unreasonable.

We determine POP's argument that the permit was issued by a Department official who did not have delegated authority to do so to be without sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E). POP's argument mistakenly postulates that the permit was issued by a DLUR environmental specialist. It was issued by the DLUR director, to whom authority was properly delegated by the Land Use Management assistant commissioner, who derived that authority from the Commissioner via Administrative Order No. 2014-10, see N.J.S.A. 13:1B-4.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

Affirmed.