**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0259-22
                     A-0695-22

M.M. AND R.M.,[1]

      Petitioners-Appellants,

v.

DEPARTMENT OF CHILDREN
AND FAMILIES,

      Respondent-Respondent.

_____

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.H. AND J.O.,

      Defendants-Respondents.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF D.H.,
a minor.

_____

<table>
<tr><td>

**APPROVED FOR PUBLICATION**

**August 28, 2024**

**APPELLATE DIVISION**

</td></tr>
</table>

---

[1] To protect the privacy of the parties, we refer to individuals by their initials. See R. 1:38-3(d).

_____

Argued February 6, 2024 – Decided August 28, 2024

Before Judges Sumners, Smith and Perez Friscia.

On appeal from the New Jersey Department of Children and Families and the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket Nos. 22-0145 and FG-11-0035-20.

Eric R. Foley argued the cause for appellants (Law Office of Louis Guzzo, attorneys; Eric R. Foley, on the briefs).

Karen Cavalier, Deputy Attorney General, argued the cause for respondent Department of Children and Families (Matthew J. Platkin, Attorney General, attorney; Sara M. Gregory, Assistant Attorney General, of counsel; Karen Cavalier, on the brief).

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minor (Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, of counsel and on the briefs).

Deric D. Wu, Assistant Deputy Public Defender, argued the cause for respondent J.O. (Jennifer Nicole Sellitti, Public Defender, attorney; Deric D. Wu, of counsel and on the brief).

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for respondent M.H. (Jennifer Nicole Sellitti, Public Defender, attorney; Adrienne Kalosieh, on the brief).

The opinion of the court was delivered by

SMITH, J.A.D.

In this consolidated appeal, appellants and foster caregivers M.M. and R.M. appeal from a Family Part judge's order dated October 3, 2022, denying intervention in the guardianship litigation of D.H., and also appeal from a final agency decision of the Department of Children and Families (DCF) affirming removal of D.H. from their home.

Having reviewed the record and the applicable law, the Division of Child Protection and Permanency's (Division) removal of the minor child was supported by the regulatory officer's consideration of the experts' bonding evaluations which properly interpreted the law, court orders, and Division records. In addition, we affirm the trial court's order denying intervention into the guardianship proceeding in light of the 2021 statutory amendments to the Termination of Parental Rights (TPR) Statute, N.J.S.A. 30:4C-15.1, and Kinship Legal Guardianship statute, N.J.S.A. 3B:12A-1 to -7.

I

We summarize the pertinent facts. D.H. was born December 22, 2018, to M.H. and J.O. Shortly after his birth, D.H. was removed from his biological parents' care and placed in the custody of the Division. Nine days later, the Division placed him with foster-adopt resource caregivers, appellants M.M. and R.M. (the foster caregivers). In October 2019, D.H. was transferred to the custody of a paternal aunt. However, when the aunt violated a court order

approximately two months later by allowing visitation with M.H., D.H. was sent back to the foster caregivers. The Division later identified a different paternal great aunt, O.A., as a possible kinship placement.

Psychologist Barry A. Katz, PhD, was retained by the Law Guardian to conduct bonding evaluations of the relationships of D.H. and the foster caregivers and D.H. and O.A between January and March 2021. Dr. Katz opined that D.H. "has a secure bond and attachment toward [the foster caregivers] as parental figures and primary nurturing figures" and "does not have a bond or attachment with the paternal aunt." Dr. Katz concluded that if D.H. were removed from his foster caregivers' home, he would suffer harm that "will likely have a substantial negative impact on his . . . long term health." Accordingly, Dr. Katz recommended that D.H. "should remain in his current placement and not be placed with [O.A.]."

On June 23, 2021, the Division notified the foster caregivers that its goal for D.H. changed from termination of parental rights to kinship legal guardianship. The Division began assessing the possibility of placing D.H. with his paternal great aunt, O.A. About five weeks later, the trial court ordered the Division to continue to assess kinship legal guardianship and authorized visitation between D.H. and O.A. Successive court orders gradually increased visitation between D.H. and O.A. in line with the

transitional plan developed by the Division to transfer care from the foster caregivers to O.A.

The Division retained a second expert, psychologist David R. Brandwein, PsyD, to conduct psychological and bonding evaluations for M.M. and R.M. with D.H., M.H. and J.O. with D.H., and O.A. with D.H. In his August 10, 2021 report, Dr. Brandwein opined that D.H. "is securely bonded to his [foster caregivers]." In his October 3, 2021 report, Dr. Brandwein observed that while D.H. is not yet bonded to O.A., he observed "signs of an initial attachment between [D.H.] and [O.A.]." He further opined that while there is a possibility for [D.H.] to be harmed by removal from appellants' home, he is at risk of greater harm by "being completely cut off from his familial, cultural, and racial heritage." He concluded by recommending the Division "begin a process whereby D.H. will be transferred to the care of [O.A.]."

Dr. Katz conducted a second bonding evaluation of D.H. and O.A. in February 2022 and produced an updated, comprehensive evaluation report on April 16, 2022. He noted that D.H. "demonstrated stronger signs of developing an attachment toward [O.A.]," and his concerns with harm D.H. might experience by being removed from appellants' home "appear[ed] to be mediated in part by the ongoing visitation" with O.A. Dr. Katz wrote that the

5

current recommendation regarding permanency for [D.H.] needs to weigh in the likely attachment trauma he would experience at loss of his primary nurturing figures with the advantage he would gain at being placed with a biological family member who would then be in a position for [D.H.] to have more extensive contact, relationships, and bonds with other relatives.

Dr. Katz accordingly opined that "there is an argument to be made that [D.H.] would suffer less loss and trauma should he . . . begin transferring custody to [O.A.] at this time rather than a later date." He concluded that "[g]iven the recent change in law along with the ongoing involvement of the aunt and biological relatives in [D.H.]'s life . . . the long-term benefit of [D.H.] transitioning to the permanent care of [O.A.] would cause less harm."

On March 22, 2022, the foster caregivers received notice of the Division's Mercer North Local Office's plan to change the placement of D.H. to O.A. They then requested a dispositional review of the transfer by DCF.[2] On April 8, 2022, the Division conducted a family team meeting with the foster caregivers and O.A., where the parties reached consensus regarding upcoming overnight visits and the transitional plan in general.

---

[2] N.J.A.C. 3A:5-3.1(a)(2) requires—subject to certain listed exceptions—a dispositional review if a foster caregiver "disagrees with the removal of a child receiving foster care in his or her resource home when the child has been residing with the resource parent for at least six months . . . ."

On April 26, 2022, the Division notified the foster caregivers that D.H. would be removed from their home within thirty days pursuant to the transitional plan. DCF notified the foster caregivers that a dispositional review hearing would take place virtually on June 13, 2022.

On May 25, 2022, the foster caregivers moved for the following relief: (1) a stay of any change in placement by of D.H. by the Division; (2) permitting them full, or in the alternative, limited intervention in this current Family Part litigation pursuant to Rule 4:33-1 and Rule 4:33-2; (3) in the alternative, a consolidation of the Family Part matter with the administrative matter before DCF regarding the current placement of D.H.; (4) where intervention is granted, a best interest summary hearing in which the movants are permitted to present evidence regarding the best interests of D.H.; and (5) in the alternative, if intervention denied, at the court's discretion, a best interests hearing be conducted by the court where the movants could present evidence regarding the best interests of D.H. in connection with the current placement.

On June 3, 2022, the Division placed D.H. in O.A.'s home and fully within her care. The foster caregivers testified at the dispositional review hearing and submitted a sworn statement from a Court Appointed Special Advocate (CASA) caseworker claiming that O.A. was allowing contact

between D.H. and his biological father in violation of a court order. The hearing officer did not consider the statement, finding that dispositional review was not the appropriate forum for the caregivers' submission, as the hearing officer was "assigned to review whether the removal of the child from [the] resource home was appropriate per [Division] policy," and not perform an assessment of the appropriateness of the child's current kinship caregiver.

On August 12, 2022, DCF issued its final decision affirming the Mercer North Local Office's decision to remove D.H. from the foster caregivers' home. As part of its review, the DCF considered bonding evaluation reports by Dr. Katz dated March 12, 2021, March 3, 2022, and April 16, 2022; and by Dr. Brandwein dated August 10, 2021, and October 3, 2021; DCPP contact sheets; and guardianship orders issued by the Family Part. It found the Division's decision to move D.H. "to his paternal great aunt is supported by the research in child welfare that . . . development is enhanced when placed with kin."

The Family Part conducted a hearing on September 19, 2022. At the hearing, the foster caregivers conceded their requests to consolidate the administrative hearing and to stay any placement of D.H. were moot. On October 3, 2022, the court issued an order denying the foster caregivers' motion. In its written statement of reasons, the court found they did not have standing to intervene as of right pursuant to Rule 4:33-1. The court also

denied their request for permissive intervention pursuant to Rule 4:33-2. Additionally, the court found the foster caregivers failed to establish they were D.H.'s psychological parents. The foster caregivers were further denied their alternative request for a summary hearing.

In separate appeals, the foster caregivers challenged both the DCF's final decision affirming D.H.'s removal from their home and the Family Part's order denying intervention and related relief. On February 2, 2023, we ordered that the appeals be consolidated. On April 3, 2023, we granted D.H.'s motion to intervene in the administrative appeal.

The foster caregivers contend that the final agency decision to remove D.H. from their home was arbitrary, capricious and unreasonable. In addition, they argue that the trial court: misapplied the prevailing legal standards in denying their motion to intervene as of right pursuant to Rule 4:33-1; erred in finding they have not met the standards for permissive intervention pursuant to Rule 4:33-2; and finally, misapplied the recent statutory changes to the law regarding kinship placement.

II

We begin by reviewing the 2021 Legislative changes to both the TPR Statute, N.J.S.A. 30:4C-15.1, and KLG statute, N.J.S.A. 3B:12A-1 to -7. In June 2021, a section of the TPR statute, N.J.S.A. 30:4C-15.1(a)(2), was

amended to change the standards used when initiating petitions to terminate parental rights. One of the substantive changes was to a sentence within the second prong of the "best interest test," which the Legislature deleted. It stated: "Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child." N.J.S.A. 30:4C-15.1(a)(2) (amended 2021). We have interpreted this deletion narrowly, so that evidence of a child's bonding relationship with their foster family is wholly separate from "consideration of whether a parent is able to overcome harm to the child as well as whether the parent can cease causing future harm." N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 25 (App. Div. 2022), aff'd, 256 N.J. 4 (2023). For completeness' sake we note that we have concluded evidence of a child's bonding relationship with the foster caregivers is not completely barred from consideration and may be used by our trial courts when conducting a best interest analysis using subsections (a)(1), (a)(3), and (a)(4). Ibid.

At the time it amended N.J.S.A. 30:4C-15.1(a)(2), the Legislature also amended the KLG statute. It made the following relevant findings:

> a. Foster care is intended by existing state and federal statute to be temporary.

b. Kinship care is the preferred resource for children who must be removed from their birth parents. There are many benefits to placing children with relatives or other kinship caregivers, such as increased stability and safety as well as the ability to maintain family connections and cultural traditions.

. . . .

d. Parental rights must be protected and preserved whenever possible.

e. Children are capable of forming healthy attachments with multiple caring adults throughout the course of their childhood, including with birth parents, temporary resource parents, extended family members, and other caring adults . . .

f. The existence of a healthy attachment between a child and the child's resource family parent does not in and of itself preclude the child from maintaining, forming or repairing relationships with the child's parent . . .

g. It is therefore necessary for the Legislature to amend current laws to strengthen support for kinship caregivers, and ensure focus on parents' fitness and the benefits of preserving the birth parent-child relationship, as opposed to considering the impact of severing the child's relationship with the resource family parents.

[L. 2021, c. 154.]

Taken as a whole, the law "strengthened the position of kinship caregivers," and was "intended to reflect a preference for viable kinship

guardians and fit parents over unrelated foster caregivers." <u>D.C.A.</u>, 474 N.J. Super. at 27.

III

We first address the foster caregivers' argument that the final agency decision affirming removal of D.H. from their home was arbitrary, capricious and unreasonable. They contend: the hearing officer ignored their testimony, contradicting the agency's stated goal of assessing the prospective relative resource home; the psychologists misinterpreted legal standards in rendering their opinions; and the Division interfered with the CASA representative.

Our scope of our review of a final agency decision is limited. <u>N.J. Dep't of Child. & Fams. v. E.L.</u>, 454 N.J. Super. 10, 21-22 (App. Div. 2018); <u>see</u> <u>In re Stallworth</u>, 208 N.J. 182, 194 (2011). "We extend substantial deference to an 'agency's interpretation and implementation of its rules enforcing the statutes for which it is responsible' based on the agency's expertise." <u>N.J. Dep't of Child. & Fams. v. R.R.</u>, 454 N.J. Super. 37, 43 (App. Div. 2018) (quoting <u>In re Freshwater Wetlands Prot. Act Rules</u>, 180 N.J. 478, 489 (2004)). Accordingly, "an appellate court reviews agency decisions under an arbitrary and capricious standard." <u>Zimmerman v. Sussex Cnty. Educ. Servs. Comm'n.</u>, 237 N.J. 465, 475 (2019) (citing <u>Stallworth</u>, 298 N.J. at 194). "An agency's determination on the merits 'will be sustained unless there is a clear showing

12

that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record.'" Saccone v. Bd. of Trs., Police & Firemen's Ret. Sys., 219 N.J. 369, 380 (2014) (quoting Russo v. Bd. of Trs., Police & Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). "The burden to make that showing 'rests upon the [party] challenging the administrative action.'" In re Att'y Gen. L. Enf't Directive Nos. 2020-5 & 2020-6, 246 N.J. 462, 489 (2021) (alteration in original) (quoting Lavezzi v. State, 219 N.J. 163, 171 (2014)).

While our standard of review is limited and we defer to an agency's decision unless it is arbitrary, capricious, or unreasonable, Saccone, 219 N.J. at 380, such deference however "is premised on our confidence that there has been a careful consideration of the facts in issue and appropriate findings addressing the critical issues in dispute." Bailey v. Bd. of Rev., 339 N.J. Super. 29, 33 (App. Div. 2001). We "insist that the agency disclose its reasons for any decision, even those based upon expertise, so that a proper, searching, and careful review by this court may be undertaken." Balagun v. Dep't of Corr., 361 N.J. Super. 199, 203 (App. Div. 2003).

The Division promulgates regulations governing when a child may be removed from a resource home in non-emergency situations. N.J.A.C. 3A:17-2.2. The first cited reason for removal is, "[t]he child's case goal is furthered or achieved by the move or a court order is being followed, for example, return

to family, placement in an adoptive home or uniting a child in placement with siblings."  N.J.A.C. 3A:17-2.2(a)(1).  The Division must inform the foster caregiver "at least [thirty] days prior to the move when the child will be removed to further or achieve the case goal or as soon as possible when a court order is being followed." N.J.A.C. 3A:17-2.3(b).

In deciding whether to remove a child's placement, the Division considers several factors, including:  the child's age; the length of stay with the resource family; the relationship between the child and the resource family; the number and impact of prior moves on the child in placement; the availability of support services to maintain the placement; the child's immediate safety; and the child's risk of future harm.  N.J.A.C. 3A:17-2.5(a).

We are not persuaded by the foster caregivers' arguments.  The final administrative decision was informed and supported by the experts' bonding evaluations.  The evaluations incorporated the law, court orders, and Division records.  While the foster caregivers' testimony was not explicitly addressed in DCF's final decision, their relationship with D.H was well-documented in the comprehensive record, including the bonding evaluations and contact sheets, which were reviewed by the Division.  The final decision acknowledged "it is clear that [M.M. and R.M.] have a genuine concern for [D.H.]'s well-being." This genuine and clearly heartfelt concern is commendable, and emblematic of

14

the many foster caregivers who open their home to children in need. However, given the Legislature's recent amendments and corresponding legislative findings, we conclude their arguments, as foster caregivers who want what they sincerely believe is best for D.H., do not support the proposition that DCF committed error. We conclude the final decision was not arbitrary, capricious or unreasonable. See Saccone, 219 N.J. at 380.

We turn to the foster caregivers' contention that DCF contradicted itself regarding the scope of its review. The hearing officer's review was limited to whether the decision made by the Mercer North Local Office to remove D.H. from appellants' home was arbitrary, capricious, and unreasonable. The decision was not a comprehensive best-interest analysis or comparison between caregivers. The hearing officer explained the statement of the CASA worker would not be considered because the review "does not assess the appropriateness of the child's current relative resource parent." The final decision addressed these factors by concluding "[t]he evidence is overwhelming that [D.H.] would be safe with either [the foster caregivers] or [O.A.]." DCF's conclusion does not result from a comparative analysis, rather the decision was limited to the DCF's removal of D.H. DCF's review properly accounted for regulatory factors such as "the child's immediate safety" and "the child's risk of future harm." N.J.A.C. 3A:17-2.5(a). The review process

15

is not a forum for foster caregivers to investigate and challenge the adequacy of another resource family's home. See N.J.A.C. 3A:17-1.2; N.J.A.C. 3A:17-2.5. Therefore, we conclude the hearing officer's statements about the scope of administrative review do not warrant reversal.

We consider the caregivers' next argument, that Drs. Katz and Brandwein misinterpreted changes to both the TPR Statute, N.J.S.A. 30:4C-15.1, and KLG statute, N.J.S.A. 3B:12A-1 to -7, to require kinship placement regardless of how long a child had been in placement in a non-relative resource home. We are unpersuaded. Our review of the record reveals no indication that Drs. Katz and Brandwein misinterpreted the law. The reports cite the relevant statutory amendments and note the stated legislative preference for kinship placements. As discussed above, the statutory amendment was "intended to reflect a preference for viable kinship guardians and fit parents over unrelated foster caregivers." D.C.A., 474 N.J. Super. at 27. Contrary to the caregivers' argument before us, the record shows the expert reports did not suggest that D.H. should be placed with O.A. regardless of the time spent in appellants' home and the bond they formed. Rather, the record shows each expert clearly considered the possible harm D.H. would suffer by being removed from the foster caregivers, recognized the significance of that possible harm, and nonetheless concluded that D.H. would

A-0259-22

suffer the least amount of long-term harm if he is removed and placed with O.A.  DCF did not rely on a record which included expert opinions grounded in a mistake of law.

IV

We now turn to appellant's arguments for intervention in the Family Part matter.  "Our Rules of Court govern intervention at trial, and the trial court's interpretation of those rules is subject to our de novo review."  New Jersey Dept. of Environmental Protection v. Exxon Mobil Corp., 453 N.J. Super. 272, 285 (App. Div. 2018) (citing Washington Commons, L.L.C. v. City of Jersey City, 416 N.J. Super. 555, 560 (App. Div. 2010)).  "We look first to the plain language of the rules and give the words their ordinary meaning."  Robertelli v. New Jersey Office of Atty. Ethics, 224 N.J. 470, 484 (2016) (citing Bridgewater-Raritan Educ. Ass'n v. Bd. of Educ. of Bridgewater-Raritan Sch. Dist., Somerset Cty., 221 N.J. 349, 361 (2015)).

Rule 4:33-2 is "the more liberal permissive intervention rule," therefore we must "review the court's determination of a permissive intervention motion under an abuse of discretion standard."  N.J. Dep't of Env't Prot. v. Exxon Mobil Corp., 453 N.J. Super. 272, 286-87 (App. Div. 2018) (citing City of Asbury Park v. Asbury Park Towers, 388 N.J. Super. 1, 12 (App. Div. 2006)).

A

We begin with appellant's arguments concerning intervention as of right pursuant to Rule 4:33-1. Intervention as of right must be granted when an unnamed party meets the following requirements:

> [1] "claims an interest relating to the property or transaction which is the subject of the action," [2] shows she "is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest," [3] demonstrates her "interest is [not] adequately represented by existing parties," and [4] files a "timely" application to intervene.
>
> [New Jersey Div. of Youth and Family Servs. v. D.P., 422 N.J. Super. 583, 590 (App. Div. 2011) (quoting R. 4:33-1).]

Specifically in the family context, motions to intervene "must be considered in light of statutory limitations." B.C. v. New Jersey Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 207 (App. Div. 2017).

In D.P. we addressed intervention by foster caregivers in court proceedings involving the best interests of the child placed in their care. 422 N.J. Super. at 587. We concluded, despite the statutory allowance for foster caregivers to have notice and be heard at certain hearings concerning the child, the Legislature has circumscribed those rights, and provided that foster caregivers "shall not be made a party to the review or hearing solely on the basis of the notice and opportunity to be heard." Id. at 599 (citing N.J.S.A.

18

9:6-8.19a). Stated plainly, resource parents do not have a right to intervene as a party unless they have some other statutory directive providing for the right.

Applying D.P. and its principles, the trial court denied the foster caregivers' motion to intervene as of right. Making findings, the court first referenced D.P.'s clear holding that foster caregivers do not have the right to intervene in guardianship proceedings. The court noted that recent changes to both the TPR and KLG statutes indicate a Legislative intent to prioritize keeping children amongst relatives or "kin." It then stated that placement of D.H. with his paternal great aunt "aligns with the amended KLG statute," especially in light of the fact that both biological parents have voiced their support of the placement. Next, the court rejected the foster caregivers' arguments that they are D.H.'s "psychological parents," finding that they failed to meet the first prong for intervention, requiring the legal parents (biological parents) consent. See V.C. v. M.J.B., 163 N.J. 200 (2000).[3]

The court found the foster caregivers could not satisfy the intervention as of right requirements, as they "failed to show any evidence of a legal interest in the subject matter of the Guardianship litigation." It further found that the caregivers' personal interests were not equivalent to the "fundamental rights to the care, custody, and nurturance of the child" possessed by a child's

---

[3] The foster caregivers have not raised this issue on appeal.

biological parents. Finally, the court found that the best interest of the child was adequately represented in this case by the Law Guardian and that the record did "not identify a circumstance wherein the best interest of the child has been impaired by the current parties."

The foster caregivers argue that the record contains significant differences which justify a departure from our holding in D.P. Alternatively, they argue D.P. did not accurately address the statutory language of N.J.S.A. 9:3-45.2, making it wrongly decided and in conflict with other relevant decisions. We do not agree.

Although our factual record differs somewhat from the record in D.P., such differences do not warrant departure from the D.P.'s principles. We note that the best interest hearing in D.P. was not dispositive to its holding. Consequently, the absence of a best interest hearing in this record is of no moment.

Relatedly, the lack of notice alleged by the foster caregivers does not warrant their standing as full parties to the guardianship litigation.

N.J.S.A. 9:3-45.2 provides in pertinent part:

> [T]he child's resource family . . . shall receive written notice of, and shall have a right to be heard at, any review or hearing held with respect to the child, but the resource family parent or relative shall not be made a party to the review or hearing solely on the basis of the notice and right to be heard.

20

The statute clearly states that foster caregivers "shall not be made a party," and we discern nothing from the plain reading of this statute which would lead us to conclude that a failure to provide notice or opportunity to be heard would change this explicit direction from the Legislature.

Similarly, alignment of the Law Guardian's and foster caregivers' opinions regarding the child's best interests was not material to the court's decision in D.P., and that alignment is not material here. It is the Law Guardian who is tasked, "as a matter of legislative preference," with assuring a child's well-being. D.P., 422 N.J. Super. at 593. See also N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div. 2002) (explaining the law guardian's role to "zealously advocate the client's cause" on the minor's behalf (citation omitted)). Therefore, the foster caregivers' interest in D.H.'s well-being, however sincere, does not displace the Law Guardian's role in representing him in the Family Part action.

We also note that the foster caregivers' right to dispositional review of DCF's placement decision does not confer standing to intervene in the Law Division action, or shield them from the court's holding in D.P. Although D.P. does not specifically reference the foster caregivers' right to dispositional review pursuant to N.J.A.C. 3A:5-3.1, it references relevant rights under the statute. D.P. illustrates this concept in the context of adoption. "The statute

21

designates the Division as the State authority to seek the petition for adoption. It does not grant an independent right to file for adoption to the resource parents." D.P., 422 N.J. Super. at 594 (citing N.J.S.A. 30:4C-26.7). The foster caregivers have not shown that their right to a dispositional hearing should be treated differently.

The foster caregivers' alternative argument for rejecting our holding in D.P. also falls short. D.P. is at odds with cases decided long before the operative statutes were amended. See e.g., Doe v. State, 165 N.J. Super. 392, 398 (App. Div. 1979) (holding "under the circumstances existing here" foster parents had standing to challenge division placement decisions).

We also reject the foster caregivers' contention that we misinterpreted the statutory language of N.J.S.A. 9:3-45.2 in D.P. The language prohibiting party standing based "solely" on an individual's status as a foster caregiver implies that a caregiver may assert some other basis for standing, distinct from their status as a foster caregiver.

In B.C. v. N.J. Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 201 (App. Div. 2017), we held that a minor child's foster caregivers, who were also their grandparents, had standing to intervene in child protection litigation to assert their "separate legal rights" under the grandparent visitation statute, N.J.S.A. 9:2-7.1. Similarly, in D.P. we concluded the separate legal rights of

22

the unrelated foster caregivers could be asserted if they could establish that they were the child's "psychological parents." Id. at 208. In sum, the foster caregivers have failed to show that they have an alternate legal basis to establish standing to intervene as of right.

B

Turning to permissive intervention under Rule 4:33-2, we begin by noting our more relaxed standard of review. See Exxon Mobil Corp., 453 N.J. Super. at 286-87. Rule 4:33-2 allows for permissive intervention by a party, within the court's discretion, "in an action if the claim or defense and the main action have a question of law or fact in common." When considering a party's motion for permissive intervention, a trial court must "liberally determine 'whether intervention will unduly delay or prejudice the adjudication of the rights of the original parties.'" B.C., 450 N.J. Super. at 208 (quoting D.P., 422 N.J. Super. at 590-91 (internal citations omitted)). In the context of family matters intervention may be appropriate in some cases, however it is "not the preferable method of proceeding." Id. at 207.

In making its findings, the trial court considered several factors, including: the promptness of the application; whether such intervention would cause undue delay; the possibility of elimination of subsequent litigation; and the extent to which intervention would further complicate litigation. Weighing

these factors in light of the underlying litigation, the court denied the foster caregivers' application for permissive intervention.

The court found that the foster caregivers' intervention was "untimely as they have known of the Division's intent to move the minor to a relative resource home since July 2021," and that "movants sat on their rights and did not intervene for nearly a year." The court further found that permitting intervention would delay the matter and "unfairly prejudice the minor child." Finally, the court found that "[e]stablishing a precedent of allowing resource parents and former resource parents to intervene in children-in-court cases on the basis of their relationship with the child" would result in cases such as this being "severely delayed and overly complicated." We conclude the trial court properly exercised its discretion when it denied permissive intervention, considering the best interest of D.H.

The foster caregivers next argue that their application was timely in light of the Law Guardian's revised opinion of what placement would be in the best interests of D.H. In addition, they argue that the court misapplied the law in finding that allowing permissive intervention "would not assist this [c]ourt, or any of the parties, in protecting the best interest of this child, which is the overall goal of the Guardianship litigation." This argument fails to show that the trial court abused its discretion or misapplied the law.

 A-0259-22

The trial court correctly pointed out the fact that the foster caregivers were notified of the Division's choice to pursue kinship legal guardianship rather than termination of parental rights in June 2021. Their argument that intervention would be "not yet ripe" because the law guardian was aligned with their interests up until March 2022 conflates the roles at play. Regardless how its opinions aligned with those of the foster caregivers, the law guardian does not represent the caregivers' interests. The trial court correctly observed that it would have been prudent for the foster caregivers to move to intervene when they first learned of the Division's change of plans to minimize delay and not unfairly prejudice D.H.

We comment briefly on the contention that the trial court misinterpreted the law underlying its decision, specifically the recent changes to the TPR and KLG statutes. The foster caregivers contend that the Legislature's modification of the law to reflect a preference for placement of children with family does not mean the law requires placement with a family member "at all costs." They argue that the Division fulfilled its legal obligations by attempting to place D.H. with family, but erred when it delayed permanency in favor of placing D.H. with O.A.

This assertion minimizes the Legislature's clear policy favoring kinship and relative placements, as well as mislabeling the final decision as adhering

to an "at all costs" policy, while ignoring the benefits for D.H. The objective of the statutory amendments was to ensure a focus on preserving the birth parent-child relationship given the "benefits to placing children with relatives or other kinship caregivers, such as increased stability and safety as well as the ability to maintain family connections and cultural traditions." L. 2021, c. 154, §1(b) and (g). This objective is based on the dual premise that "[c]hildren are capable of forming healthy attachments with multiple caring adults throughout the course of their childhood," and that "[f]oster care is intended by existing state and federal statue to be temporary." Id. at §1(e).

These guidelines established the basis for the trial court's opinion, and we do not perceive the court's analysis to mean that it adhered to an approach of "family members at all costs." Nowhere in the trial court's findings or expert's reports was this language used, nor do we find support in the record for adoption of such a rigid policy.

As mandated by Legislative policy, the trial court found that both experts weighed the costs of disrupting D.H.'s attachment with the foster caregivers against the benefits of a permanent kinship placement. The experts recommended therapy and a transition plan including gradual placement. We discern no basis for disturbing the trial court's order.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

26